**CHEVRON U.S.A., INC.,**
Plaintiff-Appellee,

v.

**BELCO PETROLEUM CORPORATION,**
Defendant-Appellant.

No. 84–3410.

United States Court of Appeals,
Fifth Circuit.

March 25, 1985.

Rehearing and Rehearing En Banc
Denied April 25, 1985.

Gordon, Arata, McCollam, Stuart & Duplantis, Ewell E. Eagan, Jr., William T. D'Zurilla, New Orleans, La., for defendant-appellant.

Douglas A. Molony, Arthur P. Mitchell, Milling, Benson, Woodward, Hillyer, Pierson & Miller, H.H. Hillyer, Jr., M. Hampton Carver, New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, REAVLEY, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Applying Louisiana law, the district court awarded Chevron U.S.A., Inc. over $600,000 for gas that Chevron was entitled to take from an offshore gas well under a gas balancing contract but did not take before the well went dry. The district court decided that the parties had failed to address the risk of lost production and implied a contract term to achieve an "equitable result." Persuaded that Chevron and its sublessee, Belco Petroleum Corporation, allocated to Chevron the risk of lost production, we reverse.

## I

Chevron is the lessee from the government of an offshore oil lease on the outer continental shelf off the Louisiana coast. In 1971, Chevron and Belco executed a farmout agreement, under which Belco agreed to drill and operate wells on the tract in return for an assignment of the lease, subject to a one-eighth overriding royalty in favor of Chevron, if production was obtained.

Belco obtained gas production and applied to the Federal Power Commission for a certificate of public convenience and necessity. In its application, Belco sought FPC permission to sell its gas to Tennessee Gas Pipeline Company at 45 cents per thousand cubic feet, plus small annual increases, rather than the "area rate" of .26/MCF applicable to other producers. Chevron declined to participate in the ratemaking proceedings. The FPC granted Belco's request, conditioned on Belco's promise to "plow back" its .19/MCF of extra revenue into oil and gas exploration in southern Louisiana for ten years or under certain

conditions to pass this back through to Tennessee's customers. Belco began selling gas to Tennessee Gas Pipeline in October of 1973.

Belco offered to pay Chevron its overriding royalty in cash, but Chevron, preferring to rely upon its own marketing effort, decided to take its gas in kind. In 1974, Chevron sent Belco a proposed "gas balancing" agreement. This draft provided that if a party did not dispose of its share of gas, the other could take more than its share, but had to maintain a "gas in storage" account reflecting its draw of the other's gas. The underproducing party could at any time choose to begin taking and selling its share, plus 25% of the overproducer's share, until the account was in balance.

Belco misplaced its copy of the proposed agreement, and asked Chevron to send another. Chevron considered sending a different version of the contract containing a "cash balancing" clause, under which the overproducing party would repay the underproducer in cash if the field was depleted with the account out of balance. Chevron's negotiator testified that he thought a cash balancing clause was unnecessary because the field was thought to contain large gas reserves. The district court found that because "Chevron wanted to avoid the confusion of submitting a different proposal," Chevron sent Belco a copy of the first draft, which omitted treatment of the risk of lost production. Belco signed it without modification on June 6, 1975.

Chevron contracted to sell its share of production to Tennessee Gas Pipeline, and applied for its own FPC certificate in December 1976. The certificate was not issued until October 1979—four months after the field had stopped producing. Having taken no gas in kind, Chevron demanded from Belco a cash payment of one-eighth of the revenues from the sale of the field's gas. Belco refused, and Chevron sued.

After a bench trial, the district court, citing Louisiana Civil Code articles 1903 and 1965, recodified as articles 2054 and 2055,[1] used equitable principles of unjust enrichment to supply the "missing" contract term, and upheld Chevron's claim. The court awarded Chevron one-eighth of the revenues actually received by Belco at its FPC-approved premium price, minus Chevron's share of the one-sixth federal royalty, for a judgment of $619,052.85.

## II

■■■ The district court's resort to equity in concluding that Belco should compensate Chevron in cash for its gas in storage was justified only if the parties did not contractually allocate the risk of lost production. "When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent ...." Louisiana Civil Code art. 1963 (1870).[2] The intent of Chevron and Belco, if any, is to be determined only from the words of their contract if that contract on its face is clear, explicit, and leads to no absurd consequences. Louisiana Civil Code art. 1945(3) (1870), *recodified as* art. 2046 (1985). The facial interpretation of the contract is a question of law not subject to the clearly

---

1. Article 2054:

   When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.

   Article 2055:

   Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.

   Usage, as intended in the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation.

2. The newly revised Civil Code articles covering the interpretation of contracts retain this principle. Only when the parties do not provide for a particular situation, La.Civ.Code art. 2054 (1985), or do so ambiguously, La.Civ.Code art. 2053 (1985), may a court turn to equity, usage, or custom.

erroneous standard. *Makofsky v. Cunningham*, 576 F.2d 1223, 1229 n. 7 (5th Cir.1978); *Kemp v. Hudnall*, 423 So.2d 1260 (La.App.1982), *writ denied*, 428 So.2d 474 (La.1983); *Wilson v. Cost + Plus of Vivian, Inc.*, 375 So.2d 683 (La.App.1979).

■ We read the gas balancing agreement to unambiguously provide the exclusive means for Chevron and Belco to bring their gas account into balance. Paragraph 3 of the agreement states:

> To allow the recovery of gas in storage and to balance the gas account of the parties in accordance with their respective interests, ... a party with gas in storage shall be entitled to take or deliver to a purchaser its current share of the gas produced ... plus up to 25% of the other party's share of gas production ... until such time as that quantity of gas in storage shall be reduced to zero.

Given this specific designation of a particular method of in-kind balancing as the proper way of reconciling the account, there is no room for the contention that the parties left open the possibility that cash balancing or some other form of balancing might nonetheless be used. Because the contract, on its face, only provided for in-kind balancing, Belco breached no contractual duty to Chevron when it refused to pay Chevron in cash. *See Decker v. Marchese*, 413 So.2d 210 (La.App.1982) (defendant who contracted to make specified repairs to house was not obligated to repair defect not on list).

■ Chevron notes that in the introduction to the gas balancing agreement, the parties reaffirmed that Chevron was "entitled to own and share in" one-eighth of the gas well's production, and Belco in seven-eighths. It argues that our subscribed reading of the balancing clause deprives it of its ownership of one-eighth of the gas, and deprives the introductory paragraph of the contract of meaning. We disagree. Under this scheme, the underproduced party bore the risk that the gas well would be depleted before the underproducer could produce, and thus own, all or any of its share. Chevron's argument that Belco sold "Chevron's gas" to its pipeline customer is not contractual, but is more of an equitable claim of unjust enrichment—one that cannot supersede the contrary terms of the contract. *Edmonston v. A-Second Mortgage Co.*, 289 So.2d 116, 122 (La.1974); *McDonald v. Champagne*, 340 So.2d 1025 (La.App.1976).

■ The district court, by resort to equitable principles of Louisiana law, supplied a contractual provision that Chevron deliberately omitted on the theory that only if both parties intended its omission should equity not so intervene. We have concluded that the executed contract, without the paragraph giving to Chevron a cash option in the event production is lost, on its face allocated the risk of lost production to Chevron. Under Louisiana's four-corners rule, as stated in Civil Code article 2046, the fact that both parties signed an explicit, unambiguous contract is conclusive evidence of their mutual intent. Thus, we reject the district court's underlying premise that because Chevron unilaterally rejected the clause which would have protected it, there was no bilateral agreement as to the risk of lost production.

The court below stated that "it would be absurd to conclude that Chevron waived its right to recoup its share by omitting a cash-balancing clause, in the absence of evidence to that fact." The argument would be that Chevron, which paid $770,-000 for an offshore lease, and expressly reserved a one-eighth interest in its sublease, had no reason to sign a contract that created the possibility that it would receive no revenue from the well. We do not think that our reading of the contract yields an "absurd" result in contravention of Louisiana Civil Code article 2046.

The trial court, accepting Chevron's own theory, specifically found that Chevron's motive in intentionally refraining from submitting a cash balancing clause was to "avoid the confusion of submitting a different proposal." To gain the benefit of lessened confusion, Chevron resubmitted a contract providing only for in-kind balancing, thus taking the risk that the well would

deplete and that in-kind balancing would become impossible.[3] In citing to this court its own witnesses' testimony that "the chance that Chevron might not make up in-kind was remote in the extreme," Chevron only confirms that it was reasonable for it to have taken that remote risk to achieve a modest benefit. Although the contract that Chevron proposed was, in retrospect, ill-advised, it was not absurd.

### III

Chevron also contends that the gas balancing agreement was a "loan for consumption" under article 2910 of the Louisiana Civil Code, which reads:

> The loan for consumption is an agreement by which one person delivers to another a certain quantity of things which are consumed by the use, under the obligation, by the borrower, to return to him as much of the same kind and quality.

Under article 2921, if the borrower fails to return goods equivalent to those he has borrowed, he must pay the lender the value of the thing lent. Chevron contends that under the gas balancing agreement, Chevron loaned Belco the extra gas that Belco produced, obligating Belco either to restore the gas or to pay for it.

■ Although Chevron is correct that gas is a thing that is consumed by its use, and may be an appropriate subject for a consumption loan agreement, the gas balancing contract is not such an agreement. Chevron did not deliver gas to Belco in exchange for Belco's obligation to repay. Rather, Chevron's call was upon production to the partial exclusion of Belco until the accounts were balanced. It was the geologic formation that failed to pay, not Belco.

REVERSED.

**3.** That the contract as signed allocated the risk of lost product to Chevron is implicit in the explanation of the omission of the cash-out clause. Had the contract been identical with

and without a cash balancing provision, the "confusion of submitting a different proposal" would have been nonexistent.