**SHELL OFFSHORE, INC.,**
**Plaintiff–Appellant,**

v.

**M.H. MARR, Defendant–Appellee.**

**No. 90–3040.**

United States Court of Appeals,
Fifth Circuit.

Nov. 9, 1990.

Rehearing Denied Dec. 4, 1990.

Judith Y. Robertson, John T. McMahon, New Orleans, La., for plaintiff-appellant.

David B. Klotz, Bodenheimer, Jones, Klotz & Simmons, Shreveport, La., Evan Marr Fogelman, Dallas, Tex., for defendant-appellee.

Before REAVLEY, DUHÉ and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff–Appellant, Shell Offshore Inc. ("Shell") appeals the district court's grant of summary judgment in favor of Defendant–Appellee, M.H. Marr ("Marr") in Shell's diversity jurisdiction suit for a money judgment. Shell's claim against Marr is based on his purported anticipatory breach of a written loan agreement between the parties. We reverse the district court's determination that a provision in the subject agreement to the effect that Marr's indebtedness to Shell "shall be paid" from a share of Marr's working interest in certain gas wells constitutes an exclusive method for extinguishing the balance of that debt; and render judgment in favor of Shell and against Marr.

## I.

In February, 1989, Shell filed a complaint against Marr in the United States District Court for the Eastern District of Louisiana, seeking payment of $4.305 million, the remaining balance on Shell's $6 million loan to Marr. In his answer Marr asserted that the repayment provision of the agreement provides the exclusive method of extinguishing the debt, obviating personal responsibility. In April, 1989, Marr filed a motion for summary judgment, and in October, 1989, Shell filed a counter motion for summary judgment. The parties executed a joint stipulation of facts regarding Marr's treatment of the transaction as a loan for purposes of federal income taxes. By judgment entered January 5, 1990, the district court denied Shell's motion for summary judgment and granted Marr's, dismissing this lawsuit. In so doing the district court held that Shell could only recover the sums owed on the Marr debt from one-half (½) of his share of production proceeds in certain gas wells in Mississippi. Shell appeals.

## II.

The following facts are undisputed. Shell and Marr entered into a Joint Operating Agreement in 1971, in connection with co-working interests in the Southwest Piney Woods Field (the "Field") in Mississippi. Under the terms of the operating agreement, the Ridgeway No. 1 well was drilled in the Field and was tested in 1974 as *having the largest delivery capacity of any well ever drilled in Mississippi.* In order to develop and produce that discovery, Shell and Marr agreed to drill three more wells under the terms of the operating agreement. Those additional wells were the Stevens, the Clark, and the Edge wells (the three wells). Marr paid approximately $3 million as his share of the costs of drilling and completing the three wells. By the time they were completed it was apparent that there would be a substantial delay in producing those wells through Shell's Thomasville plant or other facilities then contemplated by Shell.

Marr voiced concern to Shell about the delay he would experience before receiving his share of the proceeds of production due to the delay in processing his gas through Shell's facilities.[1] In light of the postponement of production during the time required to build new plant facilities for processing the gas, and the resulting delay in providing an income stream to Marr, Shell proposed a so-called "purchase and buyback" arrangement involving a production payment from a portion of Marr's share of the eventual proceeds of production from the three wells. Complaining about possible tax disadvantages, Marr counterproposed that Shell lend him the money. On November 5, 1980, Shell responded in writing and offered to make such a loan to Marr. Shell's November 5th letter stated: *"Collateral* for this loan will be one-half (½) of your interest in the three wells. When the wells are placed on production, you will repay the loan out of one-half of the proceeds realized from your interest in the well." (emphasis added)

On November 12, 1980, Marr wrote to Shell stating, "The basic arrangement set forth in your letter of November 5, 1980, is satisfactory.... Therefore we request the initial loan...."

In an intra-company memorandum, Shell's Production Department characterized the proposed transaction as follows: "Attached are our letter of November 5, 1980, to Mr. M.H. Marr and his reply of November 12, 1980, which letters set forth the terms of a loan Shell will make to Marr Company. The letters are self-explanatory but following are the salient features of the loan.... (4) *Collateral* for the loan will be one-half Marr's interest in the three wells. When the wells are placed on production, the loan will be repaid out of one-half of the proceeds realized from Marr's interest in the well." (emphasis added) On December 19, 1980, Shell's management in Houston concurred in the loan approach: "Further to discussions with our staff, we concur with your plan to utilize the loan approach."

Significantly, Marr prepared the initial draft of the agreement "implementing our understanding" and sent it to Shell. Marr's draft contained a provision that "Any unextinguished balance may be paid by Marr in cash." Shell changed that provision to an option for Marr to *pre*pay in cash. That provision in the executed agreement states: "Marr retains the option to prepay and fully extinguish the balance of this indebtedness in cash at any time." The final version of the agreement (the "Agreement") executed by the parties is relatively short, and is reproduced in its entirety as Appendix A. The collateral assignment (the "Assignment") executed by Marr on January 1, 1981, and reproduced in its entirety as Appendix B, was acknowledged by him in Dallas, Texas, on that date. The Assignment refers to the Agreement as "the agreement dated this same date by and between M.H. Marr and Shell Oil Company.[2]

---

**1.** Gas produced from the Field contained a dangerous level of hydrogen sulfide and had to be specially processed to remove the poisonous content in order for the gas to be marketable.

**2.** The Agreement and the Assignment consistently refer to Shell Oil Company as the party contracting with Marr and as the principal owner and operator of the Field and of the Thomas-

There is evidence that both Shell and Marr, each experienced and sophisticated oil and gas explorers and producers, fully expected the indebtedness to be repaid from one-half of Marr's share of the proceeds of production from the three wells. There is also evidence that subsequent to the consummation of the loan the "world gas market was in a state of collapse," with the price of natural gas dropping from approximately $7.00 per mcf at the time the agreement was executed to $1.53 per mcf as of March, 1989. As a result, the value of the remaining reserves and the anticipated lives of the two remaining wells were such that one-half of Marr's share of proceeds of production could never repay more than a small fraction of the remaining indebtedness.

In July, 1984, Shell approached Marr about repayment of the balance of the debt. At that time Marr indicated he preferred to postpone such action and watch the gas market. Marr stated that he "had never made a penny at the expense of his partners and he did not plan to do so with Shell." From that representation, Shell personnel inferred that Marr intended to pay the debt in full. A similar inquiry was met with a similar reassurance in the spring of 1985, and yet again on February 20, 1987. Because of increasing doubts about Marr's true intentions, however, Shell wrote to Marr in April, 1987, requesting a resolution of the matter. Hearing nothing, Shell wrote to Marr again in July of 1988, noting the impossibility of ever recovering the loan from production and requesting that Marr state the method by which he intended to repay the balance of the debt. Marr did not respond to that letter either, so Shell placed a telephone call to Marr on August 29, 1988, during which, for the first time, Marr changed his position, denying that the $6 million advanced by Shell was a loan and classifying it as a "production payment deal." In that conversation and in his own handwritten notes about it, Marr confirmed that he had "no intention of doing anything," taking the position that Shell had made "the error

ville gas processing plant, even though the plain-

of over-estimating the reserves behind the advancements of oil pmts. & agn."

It is also undisputed that Shell paid $4.5 million to Marr in 1981, under the terms of the Agreement, and paid him an additional $1.5 million in 1982; and that for income tax purposes Marr did not report any portion of the $6 million as income in 1981 or 1982.

### III.

#### A.

This court reviews the grant of summary judgment motion de novo, using the same criteria used by the district court in the first instance. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988). We "review the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party." *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir.1986) (per curiam) (citing *Southmark Properties v. Charles House Corp.* 742 F.2d 862, 873 (5th Cir.1984)). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.*

#### B.

■ Although Marr, in the district court and in his brief to this court, continued to assert that the transaction covered by the Agreement and the Assignment was not a loan but was a production payment sale of his interest in the three wells, he abandoned that contention by the time this

tiff-appellant herein is Shell Offshore, Inc.

court heard oral arguments. At that time, Marr's counsel characterized the transaction as one of loan. We agree. Despite the curious fact that Marr, in preparing the initial draft of the Agreement and Shell in revising it, assiduously avoided terminology customarily associated with loan, sale or any other nominate contract[3], the Agreement is clearly one of loan, as now acknowledged by both parties.

Although both the Agreement and the Assignment are silent as to choice of law and are not drafted in formats consistent with Louisiana nominate contracts, we note as did the district court that both parties have, at least by implication, agreed that the substantive law of Louisiana applies. This despite the fact that Marr resides and is domiciled in Texas; that the initial draft of the Agreement was prepared in Texas; that the funds were paid to Marr in Texas; that the wells in question are located in Mississippi; that the gas in question was intended to be and was in fact processed and sold in Mississippi; that the Assignment could have efficacy against third parties in no jurisdiction other than in Mississippi,[4] and that the only connection with the State of Louisiana is Shell's principal place of business (and possibly its state of incorporation although that is not evident from the summary judgment evidence before this court). Still, neither party questioned the jurisdiction or venue of the district court and both consistently urged application of the substantive law of Louisiana to this case. For purposes of this appeal, we comply.

■ Now agreeing that the transaction under examination is one of loan, Marr takes the position that it was "in rem"; that, as such, he has no personal liability for repayment; and that the affirmative statement, "Marr shall pay-back to Shell from the proceeds of one-half (½) of his working interest production in the Clark, Stevens and Edge wells, all money advanced to him by Shell," specifies the one and only source to which Shell may look for repayment of the loan. Although the district court agreed with Marr, we do not.[5] Standing alone, that statement is insufficient to eschew personal liability under the law of Louisiana; any doubt is removed when that statement is read, as it must be, *in pari materiae* with the entire Agreement, but without going outside of the "four corners" of the document, much less if read in context of the correspondence between the parties and their actions before and after execution of the Agreement and the Assignment.

### C.

This is a classic Louisiana Civil Code case. The basic Louisiana law of obligations is contained in the Louisiana Civil Code of 1870, as amended, Title III of Book III, *Obligations in General.* The first article of the first chapter of Title III of Book III defines an obligation as a "legal relationship" whereby one person (the obligor) is bound to render a performance in favor of another person (the obligee); and performance may consist of giving, doing or not doing something. La.Civ.Code art. 1756. Obligations arise, inter alia, from contracts. *Id.* art. 1757. An obligation may give the obligee the right to enforce the performance that the obligor is bound

---

**3.** The Agreement is merely titled "AGREEMENT" without modifying words such as "sales," "loan" or the like; Shell is said to have "advanced" the funds to Marr, not "loaned" or "paid"; the term "pay-back" is used rather than "pay" or "repay"; the collateral arrangement is referred to as Shell's "right to recover" from one-half of Marr's interest in the three wells; and Shell's anticipated recovery is referred to as "received" pay-back in full.

**4.** There is no evidence in the record as to whether the Assignment was ever recorded in Mississippi in order to encumber the assigned interest.

**5.** The district court relied on our holding in *Chevron v. Belco Petroleum Corp.*, 755 F.2d 1151 (5th Cir.1985) to find that Shell's exclusive remedy for repayment of the loan was from one-half of Marr's production as evidenced in the four corners of the Agreement. The district court however failed to recognize that the contract between Marr and Shell was a loan of consumption, which under Louisiana law personally obligates the borrower to repay the amount absent express language to the contrary. *See, e.g.,* La.Civ.Code arts. 2053, 2054, 2057, 3182; *see also infra* discussion in part IV. A & B.

to render. *Id.* art. 1758. "Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation." *Id.* art. 1759.

In the scheme of the Louisiana Civil Code, there are three types of obligation: a real obligation (a duty correlative and incidental to a real right), *Id.* art. 1763; a heritable obligation (one the performance of which may be enforced by a successor of the obligee or against a successor of the obligor), *Id.* art. 1765; and a "strictly personal" obligation (one the performance of which requires a special skill or qualification of the obligor), *Id.* art. 1766. In this case, the Agreement is a heritable obligation[6] and the Assignment is a real obligation; neither is a strictly personal obligation. That taxonomy should not be confused, however, with the issue of personal liability.

Under the Louisiana Civil Code, contracts are a subcategory of obligations called "conventional obligations," and are subject to special rules contained in Title IV of Book III. "A contract is an agreement by two or more parties whereby obligations are created, modified or extinguished." *Id.* art. 1906. "A contract is bilateral ... when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other." *Id.* art. 1908. "A contract is onerous when each of the parties obtains an advantage in exchange for his obligation." *Id.* art. 1909. "A contract is commutative when the performance of the obligation of each party is correlative to the performance of the other." *Id.* art. 1911. "A contract is accessory when it is made to provide security for the performance of an obligation. Suretyship, mortgage, pledge and other types of security agreements are examples of such a contract. When the secured obligation arises from a contract, either between the same or other parties, that contract is the principal contract." *Id.*

art. 1913. "Nominate contracts are those given a special designation such as sale, lease, loan or insurance. Innominate contracts are those with no special designation." *Id.* art. 1914.

As noted above, "loan" is one of the nominate contracts expressly recognized in the Louisiana Civil Code. There are two kinds of loans: the loan of things which may be used without being destroyed and the loan of things which are destroyed by being used. The former is called a "loan for use" and the latter is called a "loan for consumption" or "mutuum." *Id.* art. 2891. Either type of loan may be made gratuitously or on interest. *Id.* art. 2892. A loan of money, with or without interest, is a "loan for consumption." *Id.* arts. 2910, 2913; *see* 2 Planiol, *Civil Law Treatise*, Part 2, No. 2060.

In a loan for consumption, "[T]he borrower is obliged to restore the thing lent in the same quantity and [quality]...." La. Civ.Code art. 2920; *see* Planiol, *supra*, at No. 2067. The borrower owes interest if he fails to do so timely, payable from judicial demand. La.Civ.Code art. 2922. However, interest may be payable from the time performance (repayment of the loan) was due. *Id.* art. 2000.

Chapter 13 of Book III, Title IV of the Louisiana Civil Code contains rules for interpretation of contracts. Article 2045 tells us to determine the common intent of the parties; Article 2046, however, states that when the words of the contract are clear and explicit and "lead to no absurd consequences," no further interpretation may be made in search of the parties' intent. Article 2047 instructs us to give words of a contract their generally prevailing meaning; Article 2048 instructs that words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract, and Article 2049 provides that, when interpreting the meaning of a provision which is

---

**6.** Under terminology employed in other Civil Law jurisdictions, the Agreement might be classified as a real obligation. "Although not specifically classified as such in the Civil Codes of France or Louisiana, certain contracts that start with the delivery of a thing (res), following the

Roman tradition, are called real contracts. Such are the loan for use, the loan for consumption, deposit and pledge." 2 S. Litvinoff, *Obligations* § 112, in 7 *Louisiana Civil Law Treatise* (1975) (footnote omitted).

susceptible of different meanings, it should be given a meaning that renders it effective and not one that will render it ineffective.

Louisiana Civil Code Article 2053 states that "a doubtful provision must be interpreted in light of the nature of the contract, equity, usages, and the conduct of the parties before and after the formation of the contract." Similarly, Article 2054 states that when the parties have made no provision for a particular situation we are to assume they intended to bind themselves not only to the express provision of the contract but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. In defining such terms for purposes of Articles 2053 and 2054, Article 2055 states that "equity" is intended to express the principle that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.

## IV.

### A.

■ Before applying those rules of construction to analyze the Agreement in the context of the foregoing code provisions affecting obligations, it is important to reiterate a basic truism of the Louisiana law of Obligations: Nowhere in the Louisiana Civil Code are there provisions which contemplate "in rem" obligations, i.e., obligations in which the obligor is not personally responsible for performance or, conversely, in which the obligee may obtain performance only from the *res*. To the contrary, the Louisiana Civil Code contemplates that the obligor is always personally bound to perform his obligations. *See, e.g.*, La.Civ. Code art. 3182 ("Whoever has bound himself personally, is obliged to fulfill his engagements out of all his property, movable and immovable, present and future"); *Id.* art. 3183 ("The property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably").

■ That is not to say that Louisiana obligors and obligees cannot confect an in rem obligation; they can and they do. However, because doing so is in derogation of the Civil Code's contemplation of personal responsibility of the obligor to perform his obligations, only express provisions which clearly and unambiguously abrogate or limit the "full faith and credit" of the obligor successfully accomplish such a result. And, while the jurisprudence of Louisiana has established a rule of contractual interpretation which construes ambiguity against the party drafting the document in question, neither party is deemed to be the scrivener when, as here, the initial draft is modified and remodified in a series of exchanges between the parties to produce an execution draft reflecting give and take between obligor and obligee.

### B.

Without reiterating each step taken in classifying the Agreement and the obligations it created, it suffices that we conclude that the Agreement created the nominate contract of a gratuitous (non interest bearing) loan of consumption, a bilateral, commutative contract in which the obligation of each party is correlative to that of the other and the performance of the obligation of each party is correlative to the performance of the other. In its role as obligor, Shell rendered its performance by lending $6 million to Marr; his correlative obligation requires him to repay the amount of the loan in the time and manner provided in or implied by the Agreement. The Assignment, on the other hand, is an accessory contract securing performance of Marr's obligation under the Agreement which in this case is the principal contract.

We are satisfied that neither the district court nor the parties would disagree with our analysis up to this point. The only disputed issue is whether Marr's repayment obligation is personal or, by some clear and express determination of the parties, has been made in rem and is thus limited to half of his share of the proceeds of production from the three wells.

The summary judgment evidence proves that both Shell and Marr mistakenly believed that one-half of Marr's share of the proceeds of production from the three wells would repay Marr's debt in full. While that mutual belief may support a conclusion that neither party consciously adverted to the possibility of a "short fall" in that method of repayment, it does not follow that the parties consciously adverted to and agreed that half of Marr's proceeds of production from the three wells would be the exclusive source of repayment and that Marr would have no personal responsibility to perform the obligation of repayment.

In determining whether Marr's repayment obligation is in personam or in rem, we seek the common intent of the parties. La.Civ.Code art. 2045. Although we are not prepared to say that either personal or in rem liability would "lead to absurd consequences," neither are we prepared to say that the words of the Agreement are clear and explicit on the issue of in rem or in personam liability. Therefore we are not prohibited by Article 2046 from searching for the intent of the parties.

If we confine our search for intent to the single sentence, "Marr shall pay-back to Shell from the proceeds from one-half (½) [of] his working interest production in the Clark, Stevens, and Edge wells, all money advanced to him by Shell," we cannot, for purposes of Article 2046, find "absurd consequences" from either result, i.e., in personam or in rem. Neither, however, does that single sentence, standing alone, tell us with any real degree of certainty whether the parties intended in rem or in personam responsibility for repayment; nor, for that matter, whether the objective meanings of the words, standing alone, clearly indicate either in rem or in personam responsibility.

Similarly, when we read that quoted sentence *in pari materiae* with all provisions of the Agreement, including the provisions in the accessory contract of Assignment, we do not perceive a clear and unequivocal "in rem" result. Rather, we have either a "doubtful provision" as contemplated in Article 2053, to be "interpreted in light of the nature of the contract, equity, usages, and the conduct of the parties before and after the formation of the contract," or an agreement in which "the parties made no provision for a particular situation," (failure of the proceeds of production to liquidate the debt) as contemplated by Article 2054. If it is the latter situation, we proceed under Article 2054, which tells us that the parties intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. If, on the other hand, it is the former situation, we proceed under Article 2053 and again look to equity, usage and conduct of the parties. So, irrespective of whether the situation is within the ambit of Article 2053 or Article 2054, the term "equity" embodies the principle that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. *See* La.Civ.Code art. 2055.

As indicated above, the statement that Marr shall pay-back all money advanced to him by Shell from half the proceeds of his interest in the three wells does not, on its own, clearly and unequivocally negate the presumption found in the Civil Code that obligors are personally responsible to perform their obligations. It does not, for example, say that Marr shall "only" be obligated to repay Shell from the proceeds of one-half of his working interest production in the three wells, or that Shell may "only" obtain repayment from the proceeds of those wells. Neither does the Agreement contain a "covenant not to sue" for a deficiency judgment if the primary method of repayment fails—a concept frequently employed to maintain the existence of the primary obligation and thus the accessory agreement while as a practical matter avoiding personal liability of the obligor.

The Agreement, read in its entirety, simply fails to negate personal responsibility for repayment of the loan. There are in fact other provisions in the Agreement which comport with the presumption of personal liability. Even to such substantial operators as Shell and Marr, a $6 million loan is not insignificant: If Marr was not

personally responsible for repayment, what possible reason could he have in bargaining for an option to prepay and fully extinguish the balance "of this indebtedness in cash at any time"? From Shell's standpoint, the interest free loan to Marr of $6 million to be repaid over an uncertain length of time commencing at some uncertain future date, was substantial "consideration" for Marr's going along with Shell's delay of production pending completion of its treatment plants. It is unlikely that limiting the repayment obligation to such production proceeds would have been necessary to obtain Marr's forbearance.

Even though neither party appears to have adverted to the possibility that half of Marr's proceeds of production would fail to repay the loan in full, there is nothing in the Agreement, the Assignment, or the summary judgment evidence that reflects any purpose, motivation or consideration whatsoever for Shell to exempt Marr from personal liability to repay the loan. If Marr were now to be excused from repaying over $4 million of a $6 million loan on the strength of that one provision of the Agreement, he would clearly be taking unfair advantage of Shell and enriching himself at Shell's expense, in direct conflict with the definition of equity in Louisiana Civil Code Article 2055.[7] He would not be performing his obligation in good faith as required by Article 1759.

■ It is not uncommon in the mineral industry for obligations to be collateralized by assignments of all or a portion of the obligor's interest in the proceeds of future production. Neither is it uncommon in such situations for assignments to provide for all or a portion of the obligors "runs" to be dispersed directly to the obligee, as did the Assignment in this case. The correspondence between the parties expressed the intention to use half of Marr's share of production as *collateral* for repayment of the loan. The reason for making the loan was the delay in commencing production,

so repayment through production whenever it commences is the logical purpose of the assignment as a method and timing of repaying the loan. Absent clear and convincing language to the contrary, collateralization with assignments and direct payment of "runs" does not in any way support a contention that it relieves the obligor of personal liability. The provision which Marr would have us interpret as negating personal liability does nothing more or less than tie in the collateral arrangement with the primary method and timing for repayment.

If in the alternative Marr contends that the Agreement and the Assignment do not supply a definitive answer to the question of in rem or in personam liability, the summary judgment evidence outside of "four corners" of the documents erases any doubt. Not only does the communications between the parties confirm that they confected a "loan of consumption," it confirms that both lender and borrower fully expected and intended for the loan to be repaid in full. Although they believed that the collateral assignment would make the loan self liquidating, it is clear from even a cursory reading of all that preceded consummation of the loan, as well as all that followed until Marr's repudiation, that the parties never adverted to a release or renunciation of Marr's personal responsibility for performing the obligations of the borrower. Failure of the collateral to liquidate the loan does not obviate the obligation of the borrower for ultimate repayment.

We hold that Marr is and at all times was responsible personally for repayment of the entire $6 million loan proceeds to Shell.

## C.

■ Although neither party seriously raises the issue of prematurity, we hold nevertheless that Shell is not premature in seeking a money judgment for the remain-

---

7. "Very probably, *mutuum* [loan for consumption] became actionable not because it was specifically admitted as a contract deserving enforcement, but because of the recognition given to the general principle that if one party had

been enriched at the expense of another without any justification, the impoverished party should have an action to recover." 1 S. Litvinoff, *Obligations* § 199, in 6 *Louisiana Civil Law Treatise* (1969).

ing balance of the Marr loan. On August 29, 1988, Marr unequivocally repudiated responsibility for repaying any portion of the loan not recovered by Shell through the assigned portion of Marr's share of production proceeds from the three wells. Marr has continued to deny responsibility throughout the course of this litigation.

■ Louisiana recognizes anticipatory breach as maturing a right of action for breach of contract. *Andrew Development Corp. v. West Esplanade Corp.*, 347 So.2d 210, 212–13 (La.1977). An anticipatory breach occurs and is actionable when, prior to the time performance is due, the obligor manifests unwillingness to perform his obligation. *Lewis v. Gary*, 439 So.2d 1236 (La.Ct.App.1983). The obligee has a cause of action when the obligor signifies his intent to repudiate his obligation. *See, e.g., Fairfield Development Co. v. Jackson*, 438 So.2d 664, 671 (La.Ct.App.1983); *see also Marek v. Hardy*, 234 La. 841, 101 So.2d 689 (1958) (Recognizing the concept of anticipatory breach of contract as an actionable event, consistent with the Louisiana Civil Code); *see generally* Comment, 50 *Tulane L.Rev.* 927 (1976).

This court has recognized that unilateral anticipatory repudiation of a Louisiana contract is an active breach of contract, requiring no formal putting in default. *See Trinity Carton Company v. Falstaff Brewing Corp.*, 767 F.2d 184, 195 (5th Cir.1984); *3A's Towing Co. v. P & A Well Service, Inc.*, 642 F.2d 756, 760 (5th Cir.1981). Shell's action is not premature.

### D.

■ Despite the provisions of Article 2922 specifying interest from date of judicial demand, in this instance Shell is entitled to interest on the amount remaining due under the Marr loan from August 29, 1988, the date Marr unequivocally repudiated his obligation of repayment. *See* La. Civ.Code art. 2000. The Agreement is silent on the issue of interest so the rate of interest to which Shell is entitled is the legal rate, to be calculated pursuant to Paragraph B of Article 2924.

### CONCLUSION

For the foregoing reasons the district court's summary judgment in favor of Marr is REVERSED, and judgment is RENDERED in favor of Shell in the principal sum of $4,305,000.00 (less credit for any funds which may have been recovered by Shell under the Assignment since calculation of that amount), plus legal interest on the amount due from August 29, 1988, until paid in full; with all costs assessed to Marr.

### APPENDIX A

### AGREEMENT

This Agreement made and entered into this the first day of January, 1981 between SHELL OIL COMPANY whose address is One Shell Square, New Orleans, Louisiana; herein called "Shell" and M.H. MARR whose address is 2500 Republic National Bank Building, Dallas, Texas; herein called "MARR",

WITNESSETH:

Whereas, Shell is the principal owner and operator of the Southwest Piney Woods Field, situated in Rankin and Simpson Counties, Mississippi and is also the owner and operator of the Thomasville Gas Processing Plant, situated several miles north of the Southwest Piney Woods Field, together with a pipeline connecting the two; and

Whereas, Marr owns a working interest in the entire Southwest Piney Woods Field and has a processing contract with Shell under which his gas is transported to and processed in the Thomasville Plant. Currently Shell is processing in the Thomasville Plant all production from the Ridgway Unit well located in the Southwest Piney Woods Field; and

Whereas, from said Southwest Piney Woods Field there is also available for delivery to a processing plant, the production from the Clark Unit well and the Stevens Unit well, both completed and shut-in and the Edge Unit well presently to be completed and shut-in; and

Whereas, Shell and Marr consider it impractical at this time to deliver to the Thomasville Plant the share of production owned by Marr in the Clark, Stevens, and Edge wells in the Southwest Piney Woods Field; and

Whereas, Shell may require two years to build a plant to process all production from the Southwest Piney Woods Field; and

Whereas, Marr has paid Shell approximately Three Million ($3,000,000.00) Dollars for his portion of the Clark, Stevens and Edge wells; and

Whereas, Shell recognizes that an extended delay in producing and processing Marr's share of the Clark, Stevens, and Edge wells is an unanticipated heavy financial burden on Marr;

Now Therefore, In consideration of mutual obligations and benefits, Shell has advanced to Marr the sum of Three Million ($3,000,000.00) Dollars and agrees to advance further sums of One Hundred Twenty–Five Thousand ($125,000.00) Dollars each month, commencing February 1, 1981, for a period of not to exceed two years. The total amount advanced by Shell to Marr under this Agreement shall not exceed the sum of Six Million ($6,000,000.00) Dollars. In the event the Thomasville Plant is shut down or not in operation for any reason for a period of one calendar month or longer, the monthly advances provided for herein shall temporarily cease and shall be suspended during such non-operating period and until the plant resumes operations.

If, prior to the expiration of a two year period, Shell shall commence processing Marr's share of production from the Clark, Stevens, and Edge wells in the Thomasville Plant or a New Plant, the monthly advances by Shell shall cease and pay-back to Shell by Marr shall commence.

Marr shall pay-back to Shell from the proceeds of one-half (½) his working interest production in the Clark, Stevens, and Edge wells, all money advanced to him by Shell. Marr retains the option to prepay and fully extinguish the balance of this indebtedness in cash at any time.

Subject to this Agreement, Marr has granted to Shell the right to recover from one-half (½) his interest in the Clark, Stevens, and Edge wells all money advanced hereunder. When Shell has received payback in full, Shell shall re-assign said interest to Marr.

In Witness Whereof, the parties have hereunto subscribed their names as of the date first above written.

WITNESSES:

(s) John M. McLain

(s) Carolyn A. Bazile

(s) Catherine Pfeifer

(s) Elaine Rollins

SHELL OIL COMPANY

BY (s) S.M. Paine

M.H. MARR

(s) M.H. Marr

## APPENDIX B

### ASSIGNMENT

STATE OF MISSISSIPPI

COUNTIES OF RANKIN & SIMPSON

WHEREAS, M.H. Marr is the owner of an interest in the oil, gas and mineral leases described in the pooling agreements set out in Exhibit "A" attached hereto and made a part hereof; and

WHEREAS, this assignment is made subject to the terms and provisions of an agreement dated this same date, by and between M.H. Marr and Shell Oil Company;

NOW, THEREFORE, M.H. Marr, for and in consideration of Ten Dollars ($10.00) and other Valuable Consideration, the receipt and adequacy of which is hereby acknowledged, does hereby grant to Shell Oil Company the right to recover from one-half (½) of his mineral interest in the oil, gas and mineral leases described herein the amount advanced to M.H. Marr under the agreement dated this same date by and between M.H. Marr and Shell Oil Company.

The parties intend that this assignment shall create a convenant encumbering M.H.

Marr's interest in the Clark, Stevens and Edge wells and said convenant and encumbrance shall be a convenant and encumbrance running with the land and the oil, gas and mineral leases described herein.

This assignment shall be binding upon and inure to the heirs, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, this instrument is executed this 1st day of January, 1981.

(s) M.H. Marr
M.H. Marr

STATE OF TEXAS
COUNTY OF DALLAS

BEFORE ME, the undersigned authority, a Notary Public in and for said State and County, on this day personally appeared M.H. MARR, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed and delivered the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the 1st day of January, 1981.

CATHERINE PFEIFER

Notary Public, Dallas County, Texas

My Commission Expires January 11, 1981

(s) Catherine Pfeifer

Notary Public in and for

Dallas County, Texas

### EXHIBIT "A"

Attached to and made a part of that certain assignment from M.H. Marr to Shell Oil Company dated January 1, 1981, covering lands in Rankin and Simpson Counties, Mississippi.

*Clark Unit*

Declaration of Pool dated March 27, 1979, recorded in Deed Book 673, Page 554, Chancery Clerk's Office, Simpson County, Mississippi, as amended in Amendment to Declaration of Pool, effective March 27, 1979, recorded in Book 681, Page 386, Chancery Clerk's Office, Simpson County, Mississippi.

*Stevens Unit*

Declaration of Pool dated August 7, 1978, recorded in Book 134, Page 214 of the Land Records of Rankin County, Mississippi, as amended by Amendment to Declaration of Pool dated effective August 7, 1978, recorded in Book L–142, Page 580 of the Land Records of Rankin County, Mississippi.

*Edge Unit*

Declaration of Pool dated February 8, 1980, recorded in Book L–142, Page 570 of the Land Records of Rankin County, Mississippi.