943 F.2d 561
 Roy J. INGRAFFIA, M.D., Individually and as Roy J.
Ingraffia, a Professional Corporation,
Plaintiff-Appellee-Cross-Appellant,
v.
NME HOSPITALS, INC., d/b/a Northshore Regional Medical
Center, Defendant-Appellant-Cross-Appellee.
 No. 90-3665.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 4, 1991.
Rehearing Denied Nov. 4, 1991.
 
 Daniel Aubry Ranson, Thomas L. Gaudry, Jr., Leo R. Hemelt, Windhorst, Gaudry, Talley & Ranson, Gretna, La., for defendant-appellant-cross-appellee.
 Donald L. Foret, Gary Michael Pendergast, Pendergast & Richards, New Orleans, La., for plaintiff-appellee-cross-appellant.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before KING and DUHE, Circuit Judges, and SCHWARTZ,[1] District Judge.
 DUHE, Circuit Judge.
 
 
 1
 A physician sued a hospital for breach of his contract to furnish radiology services. The district court found that the hospital had breached the contract by limiting the physician's clinical privileges in violation of the contractual provision concerning termination. Finding that no contract was confected because of a lack of mutual consent, we reverse.
 
 FACTS AND DISTRICT COURT PROCEEDINGS
 
 2
 In July 1984, Northshore Regional Medical Center, a new hospital in Slidell, Louisiana, hired Dr. Roy J. Ingraffia to establish and supervise its radiology department. Ingraffia was an experienced physician board-certified in radiology and nuclear medicine. Ingraffia, through his corporation, was to be the exclusive provider of radiology services for three years.
 
 
 3
 In August 1984, Ingraffia met with Kirk Wascom, the hospital's chief executive officer, to discuss the terms of the service contract. At that meeting, Wascom provided Ingraffia with a document titled "Clinical Department Physician Services Agreement," a form contract with blanks for names, dates, and other essential details. The form contract had signature lines for the physician, a hospital official, and a regional vice president.
 
 
 4
 In paragraphs 7(a) and 7(b), the contract included the following provisions on the term and termination of the agreement:
 
 
 5
 a. Subject to termination as provided hereinafter, this agreement shall remain in effect for a term of three (3) years beginning April 1, 1985 and ending at midnight on March 31, 1988 and shall automatically renew for successive one (1) year terms.
 
 
 6
 b. Either party may terminate this agreement without cause upon ninety (90) days' written notice to the other party.
 
 
 7
 During the next eight months, Wascom and Ingraffia's attorney exchanged correspondence on various modifications and additions to the form contract. In April 1985, Ingraffia's attorney sent to Wascom a revised version of the contract. The attorney wrote to Wascom, explaining that the contract contained a change that he called a "minor amendment": the addition of paragraph 7(d). This paragraph, which later became the focus of heated dispute, provides:
 
 
 8
 Termination of this agreement, whether by Physician, by Hospital or otherwise, and whether with or without cause hereunder, shall not operate to terminate, suspend, limit, restrict or otherwise in any manner affect Physician's or any Physician Associate's medical staff membership or clinical privileges, which shall be subject to revocation, termination, suspension, limitation or restriction solely in accordance with the grounds and applicable procedures specified by the bylaws of the Hospital's medical staff.
 
 
 9
 In a letter to Ingraffia's attorney, Wascom agreed to the addition of paragraph 7(d). He signed the contract in the space provided for the hospital official and returned it to Ingraffia's attorney, requesting that Ingraffia approve two other unrelated changes. The signature line provided for the regional vice president remained blank. Wascom explained in the letter that as soon as the attorney returned the contract, he would send it to the regional office for approval.
 
 
 10
 When Wascom received the approved contract, he sent it to the regional vice president, Barry Schochet. In May 1985, Schochet's attorney wrote back to Wascom, explaining that paragraph 7(d) was unacceptable to the regional office. The attorney proposed the following amendment agreement:
 
 
 11
 THIS AMENDMENT AGREEMENT ... shall amend and become part of [an agreement] entitled CLINICAL DEPARTMENT PHYSICIAN SERVICES AGREEMENT.... Paragraph 7-d is hereby stricken in its entirety and the following language is inserted in lieu thereof:
 
 
 12
 Upon termination of this Agreement for any reason, Physician and any Physician Associate(s) providing services hereunder agree and understand that his Medical Staff membership and privileges at the Hospital may be terminated therewith, at the option of the Hospital. Physician will deliver to Hospital a written statement executed by each Physician Associate serving pursuant to this Agreement agreeing to abide by the terms of this Agreement including the optional termination of Staff membership and privileges upon the termination of this Agreement.
 
 
 13
 The attorney also sent Wascom the original contract, which included Ingraffia's version of paragraph 7(d), signed by Schochet. But the letter directed Wascom as follows: "Do not distribute the executed contract to the physician until the Amendment Agreement has been signed in triplicate."
 
 
 14
 Blithely ignoring these instructions, Wascom gave Ingraffia the memo from Schochet's attorney, the unsigned amendment agreement, and the contract signed by Ingraffia, Wascom, and Schochet. Wascom told Ingraffia to look over the documents and to call Schochet's attorney to discuss them. Ingraffia testified that he was dissatisfied with the proposed amendment but assumed that the original contract was valid because all necessary parties had signed it.
 
 
 15
 Ingraffia also testified that on several occasions he had tried but failed to reach Schochet's attorney. According to Ingraffia, the attorney never returned his calls. In June 1985, the hospital opened, and the parties apparently forgot their unresolved dispute over the termination provision of the contract. Ingraffia hired two other radiologists to work for his corporation in providing radiology services at the hospital.
 
 
 16
 On February 10, 1988, the hospital advised Ingraffia by certified mail that his contract with the hospital would be terminated on May 10, 1988. The day after he received the termination notice, Ingraffia confronted Wascom, who explained that Ingraffia should not be concerned since the letter was a mere formality. Ingraffia continued to work as head of the radiology department. About a week before the announced termination date, Ingraffia learned that the hospital did, in fact, intend to terminate his position.
 
 
 17
 Ingraffia removed his personal belongings from the hospital in May 1988. About the same time, the hospital signed an exclusive three-year contract with the two radiologists who had formerly worked as Ingraffia's employees. In early August 1988, Ingraffia wrote Wascom a letter explaining that pursuant to his contract, he intended to immediately resume the active practice of radiology at the hospital.
 
 
 18
 A few days later, Wascom met with Ingraffia and told him that the hospital had entered into an exclusive contract with another group of radiologists. Wascom explained that Ingraffia's clinical privileges would be limited to secondary consultations but that Ingraffia would retain his medical staff membership and privileges.
 
 
 19
 Under the hospital bylaws, clinical privileges are separate and distinct from medical staff privileges. Clinical privileges include: (1) the right to admit patients for treatment, (2) access to the hospital and its facilities, equipment, and personnel, and (3) access to hospital patients for consultation, observation, treatment, and study as approved by admitting physicians, patients, and appropriate committees. Medical staff privileges are limited to: (1) the opportunity to associate with other practitioners, (2) permission to have patients admitted to the hospital, (3) the right to apply for clinical privileges, and (4) the ability to contract with the hospital to provide professional services.
 
 
 20
 The effect of limiting Ingraffia to secondary consultations was that the radiologists under exclusive contract would first review all radiology work at the hospital. Ingraffia could then give a secondary opinion, but only if a physician specifically requested his services. In their meeting, Wascom also explained that Ingraffia could not perform any invasive procedures and could not interact with patients.
 
 
 21
 After amiable attempts to resolve the dispute failed, Ingraffia sued the hospital for breach of contract and tortious interference with economic and business relations. Ingraffia argued that after terminating his exclusive contract, the hospital had breached paragraph 7(d) by limiting or restricting his clinical privileges. The hospital responded that paragraph 7(d) had never become a valid part of the contract because the parties had never achieved a meeting of the minds on this provision.
 
 
 22
 The district court reasoned that absent allegations of fraud, duress, or misrepresentation, the unambiguous contract signed by all necessary parties represented conclusive evidence of their mutual intent. Since the contract on its face was clear, explicit, and led to no absurd consequences, the court determined the parties' intent solely from the words of the contract. The court decided that the contract included paragraph 7(d) as drafted by Ingraffia's attorney.
 
 
 23
 The court interpreted that paragraph to mean that the hospital could limit Ingraffia's clinical privileges--but only in accordance with the procedures outlined in the bylaws. The court found that nothing in the bylaws allowed the hospital to evade its previous contractual obligations to Ingraffia.
 
 
 24
 Northshore Medical Center argued that Ingraffia's continued exercise of full clinical privileges would have been disruptive to the hospital's practice of granting an exclusive contract for radiology services. But as the court noted, the bylaws specifically provide that if a practitioner's conduct is disruptive to the operation of the hospital, any member of the staff or board may request in writing that the hospital take corrective actions. The court found that no such request had been made and that hospital officials had failed to follow any other outlined procedure for limiting or suspending clinical privileges. The court therefore concluded that when Northshore limited Ingraffia's privileges, it had failed to follow the procedures outlined in the bylaws and had thus violated paragraph 7(d) of the service contract.
 
 
 25
 The district court decided, however, that Ingraffia had failed to adequately prove his damages. The court explained that Northshore had the right to terminate Ingraffia's exclusive contract to provide radiology services. Northshore's breach consisted not of its termination of the exclusive contract but of its failure to follow the procedures outlined in the bylaws for terminating clinical privileges.
 
 
 26
 The true measure of damages, then, would have been the amount of money Ingraffia could have earned as a radiologist in cases for which staff physicians would have requested his services. Furthermore, these damages would have been limited to the period between May 1988 and the date that the hospital could have successfully terminated his clinical privileges in accordance with the procedures set out in the bylaws. The district court explained that Ingraffia had presented no concrete evidence that would allow the court to assess these damages.
 
 
 27
 The court refused to consider Ingraffia's claim for tortious interference with contract, explaining that the circumstances of this case do not support such a claim under Louisiana law. Finally, the court ruled that Ingraffia was entitled to recover costs and reasonable attorney's fees. Both parties appeal.
 
 
 28
 Northshore contends that the district court erred in concluding that there was a meeting of the minds resulting in the inclusion of paragraph 7(d) in the service contract. In addition, Northshore argues that even if paragraph 7(d) became a part of the contract, it did not breach the contract because it merely granted another exclusive radiology contract in accordance with hospital policies as suggested by the bylaws. Northshore also alleges that even if it breached the service contract, the trial court erred in failing to require Ingraffia to exhaust administrative remedies set forth in the bylaws before pursuing a civil action for breach.
 
 
 29
 Ingraffia challenges the district court's refusal to award damages. He contends that he should have received an award for past income lost from August 1, 1988, the date he attempted to resume his activities at the hospital, until January 11, 1990, the date of trial. According to Ingraffia, these damages could have been calculated mathematically from the proof offered at trial. Ingraffia also argues that the district court abused its discretion in failing to award future lost income. Finally, Ingraffia argues that the court erred in refusing to recognize his claim for tortious interference with contract.
 
 DISCUSSION
 Contract Formation
 
 30
 The district court articulated this valid rule of contract interpretation: the intent of the parties "is to be determined only from the words of their contract if that contract on its face is clear, explicit, and leads to no absurd consequences." Chevron, U.S.A., Inc. v. Belco Petroleum Corp., 755 F.2d 1151, 1153 (5th Cir.), cert. denied, 474 U.S. 847, 106 S.Ct. 140, 88 L.Ed.2d 116 (1985); see La.Civ.Code Ann. art. 2046 (West 1991). Because all three necessary parties had signed the document containing Ingraffia's version of paragraph 7(d), the court concluded that the document must be interpreted according to its literal words. The court thus applied the familiar four-corners doctrine of contract interpretation. See Huggs, Inc. v. LPC Energy, Inc., 889 F.2d 649, 651 (5th Cir.1989); Belco Petroleum, 755 F.2d at 1154; Horton v. Mobley, 578 So.2d 977, 982 (La.Ct.App.1991).
 
 
 31
 We believe, however, that the court launched into the task of contract interpretation before considering the basic requirements for contract formation. Under Louisiana law, four elements are necessary for the confection of a valid contract: (1) the parties must have the capacity to contract; (2) the parties must freely give their mutual consent to the contract; (3) the parties must have a cause or reason for obligating themselves; and (4) the contract must have a lawful purpose. La.Civ.Code Ann. arts. 1918, 1927, 1966, 1971, 2029 cmt. b (West 1991); Higgins v. Spencer, 531 So.2d 768, 770 (La.Ct.App.), cert. denied, 532 So.2d 106 (La.1988); Thebner v. Xerox Corp., 480 So.2d 454, 457 (La.Ct.App.1985), cert. denied, 484 So.2d 139 (La.1986).
 
 
 32
 Louisiana law explains the third element--the element of mutual consent--as follows:
 
 
 33
 A contract is formed by the consent of the parties established through offer and acceptance.
 
 
 34
 Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.
 
 
 35
 La.Civ.Code Ann. art. 1927 (West 1991).
 
 
 36
 The uncontradicted evidence revealed that mutual consent was missing in this case. See Cloud Constr., Inc. v. Schneider, Inc., 491 So.2d 32, 35 (La.Ct.App.), cert. denied, 494 So.2d 334 (La.1986). Ingraffia received a letter from Wascom explaining that the contract must be approved by the regional office. Instead of receiving unqualified approval or acceptance of the contract, Ingraffia received clear disapproval.
 
 
 37
 Ignoring the advice of his attorney, Wascom erroneously handed Ingraffia the version of the contract proposed by Ingraffia and signed by all necessary parties. But at the same time, Wascom gave Ingraffia a proposed amendment to paragraph 7(d) along with the regional vice president's memorandum explaining that Ingraffia's version of paragraph 7(d) was unacceptable.
 
 
 38
 "A contract is null when the requirements for its formation have not been met." La.Civ.Code Ann. art. 1927 (West 1991). An intelligent, experienced physician, Ingraffia might have thought that the signed document containing his version of the agreement would be legally sufficient to protect him if a conflict arose. He could not, however, have believed that the parties mutually consented to the terms of that document because when he received the document, he also received and read a clear statement negating such consent.
 
 
 39
 There was no meeting of the minds between the parties on the contract. Both parties realized that they did not agree. Both parties were equally to blame for failing to resolve this dispute. Under these circumstances, we reach the inescapable conclusion that the parties failed to confect a valid contract because the transaction lacked the crucial element of mutual consent. See West v. Carbone, 126 So.2d 416, 420 (La.Ct.App.1960).
 
 Other Issues
 
 40
 Louisiana law provides that "[a]n acceptance not in accordance with the terms of the offer is deemed to be a counteroffer." La.Civ.Code Ann. art. 1943 (West 1991). Northshore argues that its proposed amendment to the contract constituted a counteroffer and that Ingraffia implicitly accepted that counteroffer through his silence. See La.Civ.Code Ann. arts. 1942 (West 1991). We disagree.
 
 
 41
 Louisiana law explains the concept of acceptance by silence as follows:
 
 
 42
 When, because of special circumstances, the offeree's silence leads the offeror reasonably to believe that a contract has been formed, the offer is deemed accepted.
 
 
 43
 La.Civ.Code Ann. art. 1942 (West 1991). Northshore never received the amendment to the contract signed by Ingraffia. Moreover, no hospital official ever called Ingraffia, ever met with Ingraffia, or ever wrote to Ingraffia to discuss the proposed amendment or to finalize the contract. Assuming arguendo that the proposed amendment was a counteroffer, it would have been unreasonable for hospital officials to blindly believe that a contract had been formed.
 
 
 44
 Under Louisiana law, "[w]hen, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." La.Civ.Code Ann. art. 1947 (West 1991). Ingraffia and the hospital had been exchanging written proposed contract provisions for months. They clearly contemplated the formation of a written contract. Ingraffia did not intend to be bound by Northshore's version, and Northshore did not intend to be bound by Ingraffia's version.
 
 
 45
 We therefore conclude that mutual consent was missing entirely and that no contract was formed. This conclusion precludes any claim for breach of contract and negates the possibility of recovery of attorney's fees and costs by either party. We need not consider, therefore, Ingraffia's arguments on the calculation of damages or Northshore's claim that it is entitled to attorney's fees and costs under the terms of the contract.
 
 
 46
 We agree with the district court that under Louisiana law, the facts of this case do not support a claim for tortious interference with contract. The Louisiana Supreme Court has explicitly refused "to adopt whole and undigested the fully expanded common law doctrine of interference with contract." 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 234 (La.1989). Instead, in Spurney, the court recognized a cause of action for tortious interference in extremely limited circumstances.[2] Those circumstances do not exist in this case.
 
 CONCLUSION
 
 47
 We conclude that in the absence of mutual consent, the parties failed to confect a contract under Louisiana law. Neither party is therefore entitled to damages, to attorney's fees, or to costs. In addition, Louisiana law does not allow Ingraffia to recover for tortious interference with contract under the circumstances of this case.
 
 
 48
 We therefore reverse the judgment of the district court that Northshore breached its contract to Ingraffia. We also reverse the court's decision to grant reasonable attorney's fees and costs to Ingraffia as prevailing party.
 
 
 49
 REVERSED and RENDERED.
 
 
 
 [1]
 District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [2]
 "Spurney expressly recognized a duty on the part of a corporate officer not to interfere with the corporation's contractual relations." Spencer-Wallington, Inc. v. Service Merchandise, Inc., 562 So.2d 1060, 1063 (La.Ct.App.) (citing Spurney, 538 So.2d at 229), cert. denied, 567 So.2d 109 (La.1990). "The court recognized immunity from a tortious interference suit if the officer acted within his corporate authority and under the reasonable belief that his actions were in the corporation's best interest." Id. at 1063 n. 7 (citing Spurney, 538 So.2d at 231)