670 So.2d 502 (1996)
AMOCO PRODUCTION COMPANY
v.
FINA OIL & CHEMICAL COMPANY.
No. 95 CA 1185.
Court of Appeal of Louisiana, First Circuit.
February 23, 1996.
Rehearing Denied March 29, 1996.
*505 Brett Furr, Baton Rouge, Karen K. Westall, Houston, TX, for Plaintiff/Appellant, Amoco Production Company.
Francis Barry, Jr., New Orleans, for Defendant/Appellee, Fina Oil & Chemical Company.
Before CARTER and PITCHER, JJ., and HILLARY J. CRAIN, J. Pro Tem.[1]
CARTER, Judge.
This is an appeal from a trial court judgment on cross motions for summary judgment.

BACKGROUND
Amoco Production Company (Amoco) and Fina Oil & Chemical Company (Fina) are working interest owners in the Tex W-3, RA SUA # 1 Well (Tex W-3 Well) Lake Boudreaux Field, Terrebonne Parish, Louisiana.
On March 24, 1971, Amoco and Fina's predecessor, La Terre Petroleum Corp. (La Terre),[2] entered into an operating agreement for the properties generally known as the Lake Boudreaux Prospect.[3] In the operating *506 agreement, Amoco and La Terre agreed to share the risks, costs, and production from the Lake Boudreaux Prospect on a 50/50 basis. Amoco was designated as the operator of the Prospect in the operating agreement. Under the terms of the operating agreement, each party was obligated to take in-kind or separately dispose of its proportionate share of the oil and gas produced from the unit area.[4]
Thereafter, Amoco and La Terre began drilling the Tex W-3 Well, which was completed as a producer of oil and gas. On August 1, 1972, the well was unitized in the Tex W-3 formation by the Commissioner of Conservation.
Initially, the only outlet for the natural gas produced from the Lake Boudreaux Field was an intrastate pipeline operated by Louisiana Intrastate Gas Corporation (LIGC). La Terre entered into a gas sales contract with LIGC for the sale of its share of the gas in the intrastate market. Amoco did not take and market its share of the gas at this time because Amoco had a contract with parties, which necessitated delivery of the gas to an interstate pipeline. At the time, federal regulations prohibited delivery of intrastate gas to an interstate pipeline.
On November 16, 1972, Amoco and La Terre entered into a letter agreement regarding the sale and marketing of the production from the well. In the letter agreement, Amoco and La Terre agreed that, pursuant to La Terre's agreement with LIGC, La Terre would begin marketing its share of production from the production from certain oil and gas leases.[5] The letter agreement further provided as follows:
Since Amoco does not desire, at this time, to market its share of gas production saved and sold, it is agreed that Amoco's share of gas production saved and sold attributable to said oil and gas leases listed on "Exhibit A", is considered deferred for the period commencing with La Terre's first gas deliveries therefrom to Louisiana Intrastate Gas Corporation until such time as Amoco's share of the gas production saved and sold is marketed. Therefore, for the purpose hereof, it is agreed that Amoco will not be credited with any portion of the gas production saved and sold from the leases reflected on "Exhibit A" during such time, but during such time Amoco will produce the wells in accordance with La Terre's instructions.
At such time as Amoco's share of gas production is delivered to its purchaser, subject to the conditions hereafter established, La Terre will make available to Amoco and Amoco shall be entitled to and shall be permitted to take, before any processing thereof, its share of the gas production from the leases reflected on Exhibit "A" plus an additional amount of gas from said Leases 1 through 25 listed on Exhibit "A", plus Amoco's pro rata share of an additional amount of gas from Lease No. 26 listed on Exhibit "A", less the pro rata share of Phillips Petroleum Company, *507 which equals one-half of La Terre's share of such gas production until the quantity of gas deferred in accordance with the above has been produced for Amoco's account. It is understood and agreed that La Terre shall relinquish one-half of its share of the gas production as above provided from said leases reflected on Exhibit "A" only for such period of time as is required to enable Amoco to receive that volume of gas to which it would have been entitled had it commenced the sales of its gas on the same date that La Terre commenced first gas deliveries therefrom to Louisiana Intrastate Gas Corporation.
The letter agreement also provided the method by which the parties would calculate the over and under balance.[6] The November 16, 1972, agreement was never amended.
Thereafter, in December, 1977, an interstate pipeline connection became available, and Amoco began taking delivery of its share of the gas. In an effort to balance Amoco's under-production, pursuant to the November 16, 1972, letter agreement, Amoco also took delivery of the "additional amount of gas from said Leases 1 through 25 listed on Exhibit `A', plus Amoco's pro rata share of an additional amount of gas from Lease No. 26 listed on Exhibit `A', less the pro rata share of Phillips Petroleum Company," which equaled one-half of La Terre's share of such gas production.
On October 15, 1987, Tex W-3 Well was plugged and abandoned, and the production from the well permanently ceased. Between December, 1977, and October 15, 1987, Amoco was unable to receive that volume of gas to which it would have been entitled had it commenced the sale of its gas on the same date that La Terre commenced first gas deliveries. After October 15, 1987, it was impossible for Amoco to receive its equitable share of production from Tex W-3 Well. As a result, as admitted by Fina, Amoco was under-produced and Fina was over-produced by 852,087 mcf or 923,469 MMBTU of gas, which is valued at $453,751.84.

FACTS
On October 14, 1992, Amoco filed the instant suit for a money judgment against Fina. In its action, Amoco alleged that it was under-produced and that Fina was over-produced from Tex W-3 Well. Amoco further alleged that, because Tex W-3 Well was plugged and abandoned, in-kind balancing is impossible and that it is entitled to cash balancing in the amount of $453,751.84. Fina answered Amoco's petition, generally denying the allegations, raising peremptory exceptions pleading the objections of no cause of action, no right of action, and prescription, and asserting numerous defenses.[7] The parties conducted discovery, including interrogatories, requests for admission and production, and depositions.
Thereafter, Amoco filed a motion for summary judgment, contending that there were no genuine issues of material fact in dispute and that it was entitled to judgment as a matter of law. Attached to Amoco's motion were the deposition testimony of Van E. Parham, copies of the operating agreement, the letter agreement of November 16, 1972, and the gas purchase agreement with LIGC, various correspondence between the parties, Amoco's requests for and answers to admissions, as well as various jurisprudence and scholarly articles on gas balancing. In support of its motion, Amoco argued that, when the well is depleted and there is an under-production, the under-produced party is entitled to cash balancing.
Fina then filed a cross motion for summary judgment, contending that there were no genuine issues of material fact in dispute and that it was entitled to judgment as a matter of law. Attached to Fina's motion for *508 summary judgment were many of the same items submitted by Amoco as well as copies of jurisprudence and scholarly articles on the issue of gas balancing. In its memorandum in support of its motion for summary judgment and opposition to Amoco's motion for summary judgment, Fina argued that the agreements between Amoco and Fina provided for in-kind balancing of any production imbalances and that Amoco was not entitled to cash balancing.
On March 10, 1995, a hearing on the motion for summary judgment was held, and the trial court rendered judgment, granting Fina's motion for summary judgment and dismissing Amoco's claims and denying Amoco's motion for summary judgment. The judgment stated that "the contracts between the parties, i.e. the 1971 Operating Agreement and the November 16, 1972, Letter Agreement, clearly provided for `in-kind balancing", not cash balancing." The judgment was signed on March 23, 1995.
Amoco filed an application for supervisory writs with this court with regard to the denial of its motion for summary judgment and appealed the trial court judgment insofar as it granted Fina's motion for summary judgment. On June 26, 1995, this court, under docket number 95CW1259, denied Amoco's writ application, stating that the "trial court's interlocutory ruling denying relator's motion for summary judgment can be raised in its appeal of the final judgment granting defendant's motion for summary judgment."
On appeal, Amoco assigned, as error, the following specifications of error:
1. The Trial Court committed error in granting the Motion for Summary Judgment filed by Fina Oil & Chemical Company when it interpreted the Deferred Production Agreement dated November 16, 1972 inconsistently with the interpretations argued by both Amoco and Fina, and then, under its erroneous interpretation, raised and resolved material factual issues in the complete absence of any evidence regarding the material factual issues.
2. The Trial Court committed error in denying the Motion for Summary Judgment filed by Amoco Production Company when, had it properly interpreted the Deferred Production Agreement, it would have concluded that Fina has admitted all necessary facts to prevail.

SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d 1115, 1120 (La.App. 2nd Cir.), writ denied, 587 So.2d 695 (La.1991). The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966; Thompson v. South Central Bell Telephone Company, 411 So.2d 26, 27 (La. 1982); Legros v. Norcen Exploration, Inc., 583 So.2d 859, 860 (La.App. 1st Cir.), writs denied, 588 So.2d 101, 109 (La.1991).
A fact is material if its existence is essential to the plaintiff's cause of action under the applicable theory of recovery and without which the plaintiff could not prevail. Material facts are those that potentially insure or preclude recovery, affect the litigant's ultimate success, or determine the outcome of a legal dispute. Penalber v. Blount, 550 So.2d 577, 583 (La.1989).
The burden is upon the mover for summary judgment to show that no genuine issue of material fact exists, and only when reasonable minds must inevitably conclude that mover is entitled to judgment as a matter of law is summary judgment warranted. Robertson v. Our Lady of Lake Regional Medical Center, 574 So.2d 381, 384 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1136 (La.1991). To satisfy this burden, the mover must meet a strict standard by showing that it is quite clear what the truth is and excludes any real doubt as to the existence of material fact. Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d at 1120. The court must closely scrutinize the papers supporting the *509 position of the mover, while the papers of the party opposing the motion are to be treated indulgently. Ortego v. Ortego, 425 So.2d 1292, 1297 (La.App. 3rd Cir.1982), writ denied, 429 So.2d 147 (La.1983).
Summary judgments are not favored and should be used cautiously and sparingly. Penalber v. Blount, 550 So.2d at 583. In determining whether material facts have in fact been disposed of, any doubt is to be resolved against granting the summary judgment and in favor of trial on the merits. Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772, 775 (La.1980). This is true even if grave doubt exists as to a party's ability to establish disputed facts at trial. Equipment, Inc. v. Anderson Petroleum, Inc., 471 So.2d 1068, 1070-71 (La.App. 3rd Cir.1985). Where the trial court is presented with a choice of reasonable inferences to be drawn from the subsidiary facts contained in the affidavits, attached exhibits, and depositions, the reasonable inferences must be viewed in the light most favorable to the party opposing the motion. Jones v. Briley, 593 So.2d 391, 393 (La.App. 1st Cir.1991).
Appellate courts are to review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991). Because it is the applicable substantive law that determines materiality, whether or not a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Sun Belt Constructors, Division MCC Constructors, Inc. v. T & R Dragline Service, Inc., 527 So.2d 350, 352 (La.App. 5th Cir. 1988).

PRODUCTION IMBALANCES
Balancing in cash is the correction of a production imbalance by payment by the over-producer to the under-producer for the value of the amount of gas by which the over-producer is over-produced. Hunt Oil Company v. Batchelor, 93-3144 p. 3 n. 6 (La. 10/17/94); 644 So.2d 191, 195, n. 6. Balancing in kind, on the other hand, is the correction of a production imbalance by the allocation of a percentage of the over-producer's allocable gas take to the under-producer until such time as the imbalance has been corrected and the parties are again "in balance." Hunt Oil Company v. Batchelor, 644 So.2d at 195 n. 7.
Generally, balancing in-kind is the preferred method of remedying under-production. Pogo Producing Company v. Shell Offshore, Inc., 898 F.2d 1064, 1067 (5th Cir.1990). In such instances, a party who has taken less than its share of gas may make up the difference, or balance, by taking more than its share of gas until its takes have become ratable with the other party. See Patrick Martin, "The Gas Balancing Agreement: What, When, Why and How," 36 Rocky Mtn. Min. L. Inst. 13-1 (1990). The rule favoring in-kind balancing, as a general matter, discourages an under-produced party from alternatively demanding balancing in cash or in-kind as the market favors him. See Pogo Producing Company v. Shell Offshore, Inc., 898 F.2d at 1066. However, in some instances, where this in-kind method of balancing will not permit the under-produced party to recover his just or equitable share, that party may make up by cash balancing, i.e., requiring the over-produced party to pay him for his share of the gas that he did not receive. Pogo Producing Company v. Shell Offshore, Inc., 898 F.2d at 1066-67.
In Amoco Production Company v. Thompson, 516 So.2d 376 (La.App. 1st Cir.1987), writs denied, 520 So.2d 118 (La.1988), which is generally referred to as Amoco I, the court held that, while the preferred method of partitioning gas produced is in-kind, the Commissioner of Conservation has the power, under certain circumstances, to order alternative methods of partition, including cash balancing, depending on the circumstances. Subsequently in the appeal from the remand, in Amoco Production Company v. Thompson, 566 So.2d 138, 145-46 (La.App. 1st Cir.), writs denied, 571 So.2d 627, 628 (La.1990), which is generally referred to as Amoco II, the appellate court upheld the Commissioner's determination that, because a viable market for the non-taking owners' share did not exist during part of the time period at *510 issue, balancing in cash should be made by the over-produced owners for that time period.
In Hunt Oil Company v. Batchelor, 644 So.2d at 205, the Louisiana Supreme Court upheld a Commissioner of Conservation order denying a request for balancing in cash and ordering balancing in-kind to correct gas production imbalances. The court in Hunt Oil Company v. Batchelor, 644 So.2d at 204-205, noted that:
[T]he situation presented by this case and others like it, e.g., Amoco I and II, was entirely within the ability of the owners to prevent. The owners could easily have entered into a gas balancing agreement or inserted a provision addressing the issue of imbalances in a joint operating agreement. The owners involved in the instant case failed to do so, despite the existence of case law and commentary which clearly demonstrates that owners not covered by a joint operating agreement or a gas balancing agreement proceed at their own peril. As is evident from the paucity of case law on the subject of gas balancing and the proliferation of commentary on the same subject, most gas imbalances are resolved through the use of a gas balancing agreement among the owners. (footnote omitted.)
In Ellwood Oil Company v. Anderson, 26,907 (La.App. 2nd Cir. 5/10/95); 655 So.2d 694, writ denied, 95-1485 (La. 10/6/95); 661 So.2d 466, which Amoco argues is on point with the facts of the instant case, the operating agreement between the parties did not require the non-operator to take in-kind and to dispose of its share or to forfeit that right. If the co-owner elected not to take in-kind and to dispose of separately, the operator had authority to dispose of the non-operator's share of gas. However, the operating agreement did not contain a gas balancing provision. Nor had the parties entered into a gas balancing agreement. The court determined that, when the parties make no provision in a contract for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or as necessary for the contract to achieve its purpose. Ellwood Oil Company v. Anderson, 655 So.2d at 697.[8]
Amoco I, Amoco II, and Hunt involved balancing orders by the Commissioner of Conservation. Moreover, in Amoco I, Amoco II, Hunt, and Ellwood, the parties had not entered into a gas balancing agreement,[9] nor did the operating agreement contain a provision specifically addressing a method for resolving production imbalances. Generally, these cases appear to hold that, absent an agreement between the parties specifying the method whereby production imbalances would be equalized, the particular facts and circumstances of the case will determine whether in-kind balancing or cash balancing would be used to equalize production imbalances.
However, in the instant case, the parties entered into a gas balancing agreement. Therefore, this case does not present a determination of the preferred method of balancing in the absence of an agreement between the parties, but centers on the interpretation and application of clauses in the operating agreement and the letter agreement of November 16, 1972, regarding balancing.

CONTRACT INTERPRETATION
Generally, legal agreements have the effect of law upon the parties, and, as *511 they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Belle Pass Terminal, Inc. v. John, Inc., 92-1544 p. 16 (La.App. 1st Cir. 3/11/94); 634 So.2d 466, 479, writ denied, 94-0906 (La. 6/17/94); 638 So.2d 1094; Spohrer v. Spohrer, 610 So.2d 849, 851-52 (La.App. 1st Cir.1992). In other words, a contract between the parties is the law between them, and the courts are obligated to give legal effect to such contracts according to the true intent of the parties. LSA-C.C. art. 2045; Martin Exploration Company v. Amoco Production Company, 93-0349 p. 4 (La.App. 1st Cir. 5/20/94); 637 So.2d 1202, 1205, writ denied, 94-2003 (La. 11/4/94); 644 So.2d 1048; Spohrer v. Spohrer, 610 So.2d at 852. This intent is to be determined by the words of the contract when they are clear, explicit, and lead to no absurd consequences. LSA-C.C. art. 2046; Woodrow Wilson Construction Company, Inc. v. MMR-Radon Constructors, Inc., 93-2346 p. 3 (La.App. 1st Cir. 4/8/94); 635 So.2d 758, 759, writ denied, 94-1206 (La. 7/1/94); 639 So.2d 1167; Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So.2d at 479.
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046; Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So.2d at 479; Stafford v. Jennings-Norwood Farm and Irrigation Company, Inc., 586 So.2d 735, 737 (La.App. 3rd Cir.1991), writ denied, 590 So.2d 590 (La.1992); Investors Associates Ltd. v. B.F. Trappey's Sons Inc., 500 So.2d 909, 912 (La. App. 3rd Cir.), writ denied, 502 So.2d 116 (La.1987). The rules of interpretation establish that, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit. LSA-C.C. art. 2046, comment (b); Cashio v. Shoriak, 481 So.2d 1013, 1015 (La.1986); Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So.2d at 479; Spohrer v. Spohrer, 610 So.2d at 852.
In such cases, the meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. LSA-C.C. art. 1848; Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So.2d at 479; Investors Associates Ltd. v. B.F. Trappey's Sons Inc., 500 So.2d at 912. Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. Martin Exploration Company v. Amoco Production Company, 637 So.2d at 1205; Investors Associates Ltd. v. B.F. Trappey's Sons Inc., 500 So.2d at 912.
When the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or show the intention of the parties. Martin Exploration Company v. Amoco Production Company, 637 So.2d at 1205; Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So.2d at 480. In cases in which the contract is ambiguous, the agreement shall be construed according to the intent of the parties. LSA-C.C. art. 2045. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Kuswa & Associates, Inc. v. Thibaut Construction Co., Inc., 463 So.2d 1264, 1266 (La.1985); Commercial Bank & Trust Company v. Bank of Louisiana, 487 So.2d 655, 659 (La.App. 5th Cir.1986). A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. LSA-C.C. art. 2053; Allen v. Burnett, 530 So.2d 1294, 1301 (La.App. 2nd Cir. 1988).
Whether a contract is ambiguous or not is a question of law. Spohrer v. Spohrer, 610 So.2d at 853; Myers v. Myers, 532 So.2d 490, 494 (La.App. 1st Cir.1988); Aycock v. Allied Enterprises, Inc., 517 So.2d 303, 309 (La.App. 1st Cir.1987), writs denied, 518 So.2d 512, 513 (La.1988). However, *512 where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. See G/O Enterprises, Inc. v. Mid Louisiana Gas Company, 444 So.2d 1279, 1285 (La.App. 4th Cir.), writ denied, 446 So.2d 318 (La.1984); Universal Iron Works, Inc. v. Falgout Refrigeration, Inc., 419 So.2d 1272, 1274 (La.App. 1st Cir. 1982). When appellate review is not premised upon any factual findings made at the trial level, but instead is based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. Conoco, Inc. v. Tenneco, Inc., Tennessee Gas Pipeline Company, 524 So.2d 1305, 1312 (La.App. 3rd Cir.), writ denied, 525 So.2d 1048 (La.1988). In such cases, appellate review of questions of law is simply whether the trial court was legally correct. Spohrer v. Spohrer, 610 So.2d at 853.
In the instant case, the threshold issue is whether the contract's terms are ambiguous or explicit. If the language of the contractual provisions is determined to be explicit and unambiguous, no additional evidence can be considered. Spohrer v. Spohrer, 610 So.2d at 852.
As set forth earlier, the letter agreement, dated November 16, 1972, entered into by Fina's predecessor, La Terre, and Amoco, provided as follows:
Since Amoco does not desire, at this time, to market its share of gas production saved and sold, it is agreed that Amoco's share of gas production saved and sold attributable to said oil and gas leases listed on "Exhibit A", is considered deferred for the period commencing with La Terre's first gas deliveries therefrom to Louisiana Intrastate Gas Corporation until such time as Amoco's share of the gas production saved and sold is marketed. Therefore, for the purpose hereof, it is agreed that Amoco will not be credited with any portion of the gas production saved and sold from the leases reflected on "Exhibit A" during such time, but during such time Amoco will produce the wells in accordance with La Terre's instructions.
At such time as Amoco's share of gas production is delivered to its purchaser, subject to the conditions hereafter established, La Terre will make available to Amoco and Amoco shall be entitled to and shall be permitted to take, before any processing thereof, its share of the gas production from the leases reflected on Exhibit "A" plus an additional amount of gas from said Leases 1 through 25 listed on Exhibit "A", plus Amoco's pro rata share of an additional amount of gas from Lease No. 26 listed on Exhibit "A", less the pro rata share of Phillips Petroleum Company, which equals one-half of La Terre's share of such gas production until the quantity of gas deferred in accordance with the above has been produced for Amoco's account. It is understood and agreed that La Terre shall relinquish one-half of its share of the gas production as above provided from said leases reflected on Exhibit "A" only for such period of time as is required to enable Amoco to receive that volume of gas to which it would have been entitled had it commenced the sales of its gas on the same date that La Terre commenced first gas deliveries therefrom to Louisiana Intrastate Gas Corporation. (emphasis added.)
Amoco contends that the letter agreement, dated November 16, 1972, does not apply to the facts of the instant case because the letter agreement does not address balancing at well depletion. Amoco reasons that the parties contemplated that Amoco's imbalance would have been resolved and the contract's applicability would have been terminated prior to well depletion. As a result, Amoco reasons that, pursuant to LSA-C.C. art. 2054,[10] the parties bound *513 themselves to whatever law, equity, or usage regards as implied in a contract of this kind.
Fina contends that the parties entered into a contract and addressed the manner in which the parties would correct any imbalances which would occur as a result of Amoco's decision to defer taking its share of production. In entering into the November 16, 1972, letter agreement, the parties specifically designated in-kind balancing as the method by which any production imbalances would be corrected.
After carefully reviewing the entire operating agreement and letter agreement of November 16, 1972, we find that the words are clear, concise, and unambiguous. Under the operating agreement, Amoco was required to take its share of production. When Amoco was unable to sell its proportionate share of production, Amoco entered into an agreement with Fina's predecessor to defer its taking of its share until Amoco was able or desired to commence taking its share of production. Under the agreement, the parties agreed upon the manner in which production imbalances created by Amoco's decision to defer production would be made, namely that, once Amoco commenced delivery of its share of production, Amoco would be authorized to take its share plus an amount equal to 50% of Fina's share of production. Absent such agreement by Fina's predecessor, Amoco would not have been entitled under the operating agreement to take more than its proportionate share of production. The language in the letter agreement of November 16, 1972, clearly demonstrates that the parties contemplated correcting production imbalances by in-kind balancing. Although the agreement does not expressly exclude cash balancing; it does not leave open the option for any type of balancing other than in-kind balancing. Moreover, although the agreement does not expressly provide that the proposed method of balancing would apply in the event of well depletion, the plain language of the agreement does not limit itself to balancing while the wells were producing. The failure of a contract to provide for every possible alternative does not make the contract ambiguous.
When the parties have entered into an agreement, which addresses production imbalances, the courts have enforced the provisions of the agreement. See Pogo Producing Company v. Shell Offshore, Inc., 898 F.2d at 1064, and Chevron U.S.A., Inc. v. Belco Petroleum Corporation, 755 F.2d 1151, 1154 (5th Cir.), cert. denied, 474 U.S. 847, 106 S.Ct. 140, 88 L.Ed.2d 116 (1985).
In Pogo, Pogo was under contract to deliver its share of production to a gas company, which did not have a pipeline connection to the lease. As a result, Pogo was unable to deliver its gas and did not take its share of production. Thereafter, Pogo's contract was rescinded, and Pogo began gas deliveries to another gas company. Although the well had not been depleted, Pogo and the operator discussed equalizing the production imbalances. However, Pogo refused to enter into a gas balancing agreement, which had been executed by the other lessees. To balance the under-production, Pogo initially requested that the operator balance in-kind, but subsequently requested cash balancing.
The operating agreement in Pogo provided that a party's failure to take or sell its share of production would not prohibit the other parties from producing their share of production. The operating agreement also provided as follows:
Any party's failure to timely take or sell its share of gas production shall not prohibit the other party or parties from producing their share of production, provided that non-producing party or parties may recoup or recover their share from future production and/or in cash by suitable agreement. (emphasis added.)
Pogo Producing Company v. Shell Offshore, Inc., 898 F.2d at 1065.
The court rejected Pogo's claim for cash balancing, noting that balancing in-kind is the preferred method of remedying under-production. The court determined that, although *514 circumstances may exist which make balancing in-kind inequitable, the law does not require cash balancing simply by virtue of a party's inability to market its share of production. Pogo Producing Company v. Shell Offshore, Inc., 898 F.2d at 1067.
The court, in Chevron, rejected Chevron's claim for cash balancing after the well had depleted because the balancing agreement provided only for in-kind balancing. In Chevron, the gas balancing agreement provided as follows:
To allow the recovery of gas in storage and to balance the gas account of the parties in accordance with their respective interests,... a party with gas in storage shall be entitled to take or deliver to a purchaser its current share of the gas produced ... plus up to 25% of the other party's share of gas production ... until such time as that quantity of gas in storage shall be reduced to zero.
Chevron U.S.A., Inc. v. Belco Petroleum Corporation, 755 F.2d at 1154. In interpreting this agreement, the court held that, given the specific designation of the particular method of in-kind balancing as the proper way of reconciling the imbalance, the parties did not leave open the possibility that cash balancing or some other form of balancing might be used. Chevron U.S.A., Inc. v. Belco Petroleum Corporation, 755 F.2d at 1154.
At a minimum, Pogo and Chevron establish that, where the parties have agreed to the method of balancing and failed to provide for cash balancing, that agreement will be given effect, even if it deprives a party of its pro rata share of the gas. Moreover, a fair interpretation of Chevron is that a failure to mention cash balancing in a balancing agreement will preclude that remedy, even if the well depletes.
In the instant case, Amoco and Fina's predecessor, La Terre, entered into an operating agreement wherein the parties agreed to share the risks, costs, and production from the Lake Boudreaux Prospect on a 50/50 basis. The operating agreement also required each party to take its share of production. Because of various gas contracts, Amoco was initially unable to take its share of production. Thereafter, the parties entered into another agreement regarding the sale and marketing of the production from the well wherein Amoco deferred its share of gas production attributable to the oil and gas leases. In that agreement, the parties agreed that, when Amoco began taking its share of gas production, Amoco would take its proportionate share plus an additional 50% of La Terre's share of the gas production, until the quantity of gas deferred had been produced for Amoco's account. Between December, 1977 and October, 1987 (nearly a ten-year period), Amoco took its proportionate share and an extra 50% of La Terre's share of production as contemplated in the balancing agreement. However, Amoco was unable to recoup the production imbalance because the well depleted. After well depletion, Amoco made a request for cash balancing of its under-production.
Given the specific designation in the agreement between Amoco and La Terre that in-kind balancing was the proper method of reconciling any production imbalances, we find that the parties did not leave open the possibility that cash balancing or some other form of balancing might be used. In such a case, when the parties have not agreed there will be cash balancing, the agreement will be given effect, even if the well is depleted and the party is deprived of its pro rata share of the gas.

CONCLUSION
For the foregoing reasons, the judgment of the trial court, granting Fina's motion for summary judgment and dismissing Amoco's claims and denying Amoco's motion for summary judgment, is affirmed. Costs of this appeal are assessed against Amoco.
AFFIRMED.
NOTES
[1] Judge Hillary J. Crain, retired, is serving as judge pro tempore, by special appointment of the Louisiana Supreme Court.
[2] Through various transactions and assignments, not pertinent to the issues presented in this appeal, Fina became successor to La Terre's interest.
[3] The attachment to the Operating Agreement showed that the parties contemplated that the production from some forty (40) leases would be shared by the parties as set forth in the operating agreement.
[4] The operating agreement further provided as follows:

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but not to exceed one (1) year, the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days notice of such intended sale.
[5] The attachment to the letter agreement showed that the parties contemplated that the production from some twenty-six (26) leases would be shared by the parties. Seventeen (17) of the leases referred to in the attachment to the letter agreement were the same as the leases contained in the operating agreement. However, the remaining nine (9) leases listed in the attachment to the letter agreement were not.
[6] The agreement provided that lease meter volumes, rather than purchaser's meter volumes, would be used in accounting for the gas produced and determining the over or under balance of La Terre and Amoco and that La Terre would furnish monthly statements showing production, sales, and over and under account balances.
[7] As part of its defenses, Fina alleged that the gas imbalance issues raised in Amoco's petition are governed by a letter agreement, dated November 16, 1972, between Amoco and La Terre (Fina's predecessor-in-interest) and that, if the written agreement is ambiguous with regard to the balancing issues, the agreement should be reformed to state the original intention of the parties.
[8] In Ellwood Oil Company v. Anderson, 26,907 (La.App. 2nd Cir. 5/10/95); 655 So.2d 694, writ denied, 95-1485 (La. 10/6/95); 661 So.2d 466, the issue before the court was whether the plaintiff, the under-produced owner, has a right of action against one of the over-produced owners. The court determined that such under-produced owner did indeed have a right of action against an over-produced owner, but did not address the merits of the claim for cash balancing of such under-produced owner.
[9] A gas balancing agreement is an agreement whereby the various owners of a well, unit, or lease set forth the manner in which production from the well, unit, or lease will be balanced among the owners in the event that one or more of the co-owners takes more or less than his allocable share of production from the well, unit, or lease. Hunt Oil Company v. Batchelor, 93-3144 p. 3 n. 4 (La. 10/17/94); 644 So.2d 191, 194 n. 4.
[10] LSA-C.C. art. 2054 provides as follows:

When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.
However, as noted in Stafford v. Jennings-Norwood Farm and Irrigation Company, Inc., 586 So.2d 735, 737 (La.App. 3rd Cir.1991), writ denied, 590 So.2d 590 (La.1992), equity is properly considered only when the language chosen by the parties is susceptible of more than one interpretation.