784 So.2d 752 (2001)
Renee HUBBARD, Plaintiff-Appellee,
v.
MARILYN'S MANHATTAN GROOMING, INC., Defendant-Appellant.
No. 34,467-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2001.
*753 M. Randall Donald, Monroe, Counsel for Appellant.
Blackwell, Chambliss, Henry, Caldwell & Cagle, by Sam O. Henry, III, West Monroe, Counsel for Appellee.
Before BROWN, STEWART & DREW, JJ.
DREW, J.
A pet grooming shop appeals a judgment ordering it to pay a former employee $11,156.50 in unpaid wages.
We reverse.

FACTS
Robert Milstead and his wife Marilyn operated a Monroe pet grooming business, Marilyn's Manhattan Grooming, Inc. ("MMG"). In early June 1996, Robert ran a newspaper advertisement seeking employees, which Renee Hubbard answered. What the advertisement stated was disputed by the parties. Hubbard, who claimed the advertisement stated that a bather/prepper was needed, testified that she would not have applied if it had asked for groomers only. Robert denied that the advertisement mentioned the position of bather/prepper. In any event, there is no copy of the ad in the record, and Hubbard was hired.
Robert testified that he hired Hubbard to be a groomer, which he defined as someone who could bathe, prep and groom an animal without assistance. He hoped that Hubbard, who would start out as a bather/prepper, would eventually be trained as a groomer by Marilyn. Hubbard testified that when she applied for the position she was told that she would be trained to groom and would eventually go to grooming school to become certified.
Hubbard explained that there are seven steps in prepping a pet to be groomed: removing hair knots, clipping nails, cleaning the ears, shaving the stomach, bathing the pet, brushing the coat and blow-drying the animal. Ninety percent of the pets groomed at MMG were dogs. Hubbard bathed and prepped dogs only for Marilyn, who was a certified groomer, although she did not do this for every dog groomed by Marilyn. Hubbard never performed these tasks for the other certified groomer, Brandi Williams.
After Hubbard had worked for several weeks, Robert requested that she sign an employment agreement that had already been completed with the necessary information. *754 The Milsteads discussed the agreement with Hubbard. This standard form agreement, dated June 13, 1996, stated, in part:
This agreement is made by and between, MARILYN'S MANHATTAN GROOMING INC., a Louisiana Corporation, domiciled in Ouachita Parish, Louisiana, hereinafter referred to as EMPLOYER, and RENEE HUBBARD, a competent major domiciliary of Ouachita Parish, Louisiana, hereafter referred to as EMPLOYEE. Employer and Employee agree that the first thirty (30) days of this contract shall be a probationary period, during which either party may cancel this agreement and neither party shall have any right to enforce any other terms of this agreement if cancelled during that period.
WHEREAS, Employer is desirous of hiring a full-time employee-groomer, and Employee is desirous of being employed as a full-time employee-groomer.
* * * * *
3. Employee salary or compensation shall be 40% percent of production. Employer agrees that said salary or compensation will increase to fifty percent (50%) of production at a future time when Employer, at Employer's option deems Employee's work to be of an acceptable nature. Said salary will be paid bi-monthly on the 15th and 30th day of each and every month beginning with the first month this agreement becomes effective.
* * * * *
The agreement was for a term of one year. It also contained a non-competition clause. The information about Hubbard and the "40%" of production had been added to the agreement by Marilyn.
Hubbard quit on March 6, 1997 when she was ordered to take a drug test. She had been paid minimum wage during her employment. Alleging that she was entitled to 40% of production under the terms of the employment contract, Hubbard filed suit seeking the difference between 40% of production and the minimum wage she received.

DISCUSSION
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art.2046. Only when the agreement is unclear, ambiguous, or will lead to absurd consequences, should a court go beyond the written agreement to gather the parties' true intentions. State Dept. of Transp. and Development v. Unknown Owners, 27,150 (La.App.2d Cir.9/27/95), 661 So.2d 626, writ denied, 95-2497 (La.12/15/95), 664 So.2d 459.
Whether a contract is ambiguous or not is a question of law. Amoco Production Co. v. Fina Oil & Chemical Co., 95-1185 (La.App. 1 Cir. 2/23/96), 670 So.2d 502, writ denied, 96-1024 (La.5/31/96), 673 So.2d 1037. The trial court's interpretation of the contract is a finding of fact subject to the manifest error rule. Grabert v. Greco, 95-1781 (La.App. 4th Cir.2/29/96), 670 So.2d 571; Pitts v. Bailes, 574 So.2d 511 (La.App. 3rd Cir.1991), writ denied, 580 So.2d 380 (La.1991).
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). The supreme court has set forth a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the *755 appellate court must further determine that the record establishes that the finding is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id.
Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, supra. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Id.
The words of a contract must be given their generally prevailing meaning. La. C.C. art.2047. When words are susceptible of different meanings, they must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art.2048. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art.2053.
It is significant that the Milsteads chose to use a standard form contract. La. C.C. art.2056 provides that in case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. This article further provides that a contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party.
The first issue is whether the relevant provisions of the employment contract even apply to Hubbard. We note that the agreement states that MMG is "desirous of hiring a full-time employee-groomer" and that Hubbard is "desirous of being employed as a full-time employeegroomer." Our emphasis. Although Hubbard groomed a total of 10-12 dogs before she quit, she was not considered a groomer by Robert Milstead because she was unable to groom all breeds of dogs. Nonetheless, Robert's own testimony on this point muddles the issue. He testified that he did not hire bathers and preppers. He also insisted that he did not advertise to hire bathers and preppers. Yet, Robert still hired Hubbard, who was not qualified to be a groomer, in order to train her to be a groomer, and Hubbard started as a bather before progressing to prepper. In addition, Hubbard was required to sign this employment agreement just several weeks after she began working, probably to give the Milsteads the advantage of the noncompetition clause. The Milsteads feared that Hubbard would leave to compete with them once she was trained as a groomer. We note that the employment agreement also refers to Hubbard as an employee in several places, not as an employee-groomer. In light of the fact that this is a standard form contract, we construe the "desirous of ... a full-time employee-groomer" phrase not as a limit to the application of the contract, but simply as a statement of the employment position both parties hoped Hubbard would eventually obtain.
The next issue then becomes whether Hubbard was owed additional compensation under the terms of the contract. This contract stated Hubbard was *756 to be paid 40% of production, although it is not exactly clear what constitutes "production" as this term is not defined in the employment agreement. MMG conceded that the term "production" is ambigious. It argued that the parties intended "production" to mean actual fees for grooming dogs once Hubbard learned grooming skills, not for someone else's grooming work after Hubbard simply did the bathing and prepping. MMG further maintained that Hubbard knew she was to receive minimum wage until she became a groomer and groomed enough dogs so that 40% of her production would be in excess of the minimum wage. Hubbard countered that she was to receive 40% of what she and Marilyn Milstead produced as a team.
Robert Milstead testified that the "production" clause only referred to groomers. Because he construed "production" to mean exactly what each employee did, Robert testified that Hubbard would not have earned even the minimum wage if her pay had been based upon her actual production. He explained that by paying Hubbard minimum wage, he was in effect paying her more than 40% of her actual production. Hubbard testified that at first she was paid the minimum wage, then when she signed the contract, she was to receive 40% of what she and Marilyn produced as a team. Hubbard denied that Robert ever told her that she would not receive 40% until she became a groomer.
Hubbard was paid minimum wage the entire time she was employed by the Milsteads. Surprisingly, during this time she never requested 40% of production or complained about not receiving that amount. Hubbard testified that the reason she never complained was because she assumed that the difference between the 40% and the minimum wage she received was being withheld by the Milsteads to pay for her to go to grooming school in New York. Robert denied telling this to Hubbard. He explained that when Hubbard was hired, she was told she would be paid minimum wage and could go to grooming school at her own expense. Robert testified that each employee was paid minimum wage until she became a groomer and could earn enough as a groomer in excess of minimum wage. A groomer could get a future raise to 45% of production, and could go as high as 50% if they attended grooming school and became a certified groomer.
In calculating Hubbard's production, the trial court awarded her 40% of the grooming fees earned by Marilyn Milstead. The trial court was clearly wrong in doing so as Hubbard's production encompassed only the tasks that she actually performed. Her production did not include the grooming performed by Marilyn.
Hubbard estimated that bathing and prepping the animal comprised 80-90% of the time it took to fully groom a dog. Brandi Williams, the other certified groomer, testified that in most instances, the bathing and prepping of the pet was not the most time-consuming part of the process. Even accepting Hubbard's testimony that the bathing and prepping accounted for the greater percentage of time involved in completing the entire task of grooming, the actual grooming is the primary reason customers bring their animals to pet groomers in the first place. Prepping and grooming demand different skill levels. The average person is quite capable of performing the simple task of bathing a dog; however, most are hesitant to wield scissors or razors out of fear of injuring the dog or marring the dog's appearance. It is also entirely implausible that Hubbard would receive 40% of the grooming fees for simply bathing and prepping an animal, while Williams would *757 only receive 50% as a certified groomer for bathing, prepping and grooming an animal.
We must now determine how to properly measure Hubbard's true production. Williams received 50% of her production when she bathed, prepped and groomed the dogs. If Williams did not bathe and prep the dog, but still groomed it, then she received 40% of the fee. Thus, MMG valued bathing and prepping at 20% of the total fee paid by a customer for grooming. This 20% figure is also supported by the daily records introduced into evidence. Our review of MMG's daily records reveals that customers were charged as low as $5 for a bath; while the cost of grooming would range from $22.50 to $35.
Hubbard was paid $5,752.36 while employed at MMG. The gross fees paid for dogs groomed by Marilyn during this period were $42,272.16. Apparently any amounts customers paid for bathing alone were included in the calculation of the gross grooming fees. The trial court determined Hubbard's production by multiplying $42,272.16 by 40%, to reach $16,908.86. Because Hubbard was paid $5,752.36, the trial court concluded that Hubbard was owed $11,156.50 from MMG. As noted above, this method of calculating Hubbard's production was clearly wrong.
A proper measure of Hubbard's production would be to multiply Marilyn's total grooming fees ($42,292.16) by 20%, resulting in a total of $8,454.43. Hubbard is contractually entitled to 40% of this amount, or $3,381.78, which is below the $5,752.36 that Hubbard was paid. Hubbard bathed and prepped only for Marilyn, but she did not do this for every dog groomed by Marilyn. Therefore, giving Hubbard credit for every dog groomed by Marilyn rewards her with more production than she actually performed. In conclusion, no additional money was owed by MMG to Hubbard based upon 40% of her production.

DECREE
With each party to bear its own costs, the judgment is REVERSED.