943 So.2d 1156 (2006)
Wilson NAQUIN and Gladys Naquin, Individually, and Wilson Naquin as Administrator of the Estate of His Minor Children, Wilson Naquin, Jr., Peter Naquin and Chad Naquin
v.
LOUISIANA POWER & LIGHT COMPANY.
No. 2005 CA 2103.
Court of Appeal of Louisiana, First Circuit.
September 15, 2006.
*1158 Charlton B. Ogden, III, John J. Zvonek, New Orleans, for Co-Defendant/Appellant, Entergy Louisiana, L.L.C., f/k/a Entergy Louisiana, Inc., f/k/a Louisiana Power & Light Company.
Robert T. Lorio, Covington, for Co-Defendant/Appellee, The Louisiana Land & Exploration Company.
Before: CARTER, C.J., McDONALD, and WELCH, JJ.
CARTER, C.J.
At issue in this appeal is a third party demand for indemnity asserted by co-defendants in the main demand, The Louisiana Land & Exploration Company (hereafter referred to as "LL & E") against Entergy Louisiana, L.L.C., formerly known as Entergy Louisiana, Inc. and formerly known as Louisiana Power & Light Company (hereafter referred to as "Entergy"). After a four-day trial, judgment was granted in favor of LL & E and against Entergy, finding that Entergy owed indemnification to LL & E pursuant to the terms and conditions of a 1973 Right-of-Way Permit Agreement. Entergy appealed. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
Plaintiff in the main demand, Wilson Naquin, filed suit thirteen years ago, naming Entergy and LL & E as co-defendants.[1] Plaintiff alleged in his petition that he injured his back on January 18, 1992, while operating his boat across a small cut of water located between two LL & E leased campsites on marshland property owned by LL & E near Bayou Jean Lacroix in Terrebonne Parish.[2] According to plaintiff, his forehead struck a low-hanging electric power line that was suspended *1159 between two posts and hanging across the waterway. The power line that plaintiff allegedly struck supplied electricity to the last campsite located along the well canal. The line was constructed after LL & E's lessee, Roger E. Braud, applied to Entergy for electrical service to the camp in 1984.[3] Because the leased campsite was located 580 feet away from Entergy's tie-in pole, Entergy gave Braud the option of either having Entergy construct the connecting facility at an estimated $8,000 cost to Braud or he could construct his own facility with cable donated by Entergy, and following Entergy specifications. Braud chose to construct the line himself, using Entergy's cable, with the help of an electrician.
Entergy supplied the electricity flowing through the subject line, pursuant to a 1973 Right-of-Way Permit Agreement (hereafter referred to as the "Agreement") between Entergy and LL & E. The Agreement specifically provided, in pertinent part, the following:
[LL & E], in consideration of the sum of [$10.00] cash, . . . grants unto [Entergy] . . ., its successors and assigns . . ., the right and privilege to construct, operate and maintain an electric distribution line, including poles, wires and other appurtenances, . . . upon, over and across the following described property, . . . :
A strip of land thirty (30) feet in width, measuring fifteen (15) feet on each side of the center line across the following described property:
Section 20, all lying south and west of those certain boundary lines fixed and agreed upon in those certain boundary agreements . . .
Section 28, all except NE 1/4 of NE 1/4
Section 29, all
Section 32, all
Section 33, all
In Township 19 South, Range 20 East along those portions of the routes and courses which cross the aforesaid property as are shown outlined in red on the map marked Exhibit "A" attached hereto and made a part hereof.
Subject to all of the conditions and limitations hereinafter set forth:
1. [Entergy], its successors and assigns, hereby assume the full liability and responsibility of all risks and hazards and shall be solely and directly responsible and liable for all personal injury and/or loss of life and/or damage or destruction of the property of third persons, as well as all servants and employees of [LL & E] and/or [Entergy], caused by the construction, existence, operation and maintenance of said distribution line, and shall hold [LL & E] free and harmless with respect to any and all claims for loss, death, destruction or damage arising from the construction, existence, operation and maintenance of said electric distribution line, including a reasonable attorney fee; provided, however, that [Entergy] does not agree to hold [LL & E] harmless from any liability contributed to or caused by any act of negligence of [LL & E].
Based upon the Agreement, LL & E filed a cross-claim against Entergy for indemnity. After many years of litigation, including two prior appeals[4] and a settlement *1160 of plaintiff's underlying claim, a four-day trial was had on the indemnity issue. The trial court considered testimony and evidence as to the facts and circumstances surrounding the intent of the parties at the time the Agreement was entered into. The trial court ultimately found that the purpose of the Agreement was to allow Entergy to provide electrical services to those LL & E campsites in existence at the time of the Agreement and to those campsites constructed along the well canal in the future. The trial court also found that the subject line was a necessary appurtenance to Entergy's electric distribution line system, because without the line, Entergy would not have been able to distribute electricity to the campsite. Therefore, the trial court held that Entergy must uphold its contractual obligation to indemnify LL & E for all damages, costs and attorney fees pursuant to the Agreement.
Entergy appealed, contending that there was no reasonable basis for the trial court to determine that the electric distribution line was an appurtenance as contemplated by the Agreement, and therefore, the trial court committed manifest error in holding that Entergy owed LL & E indemnity under the Agreement. Entergy's main contention on appeal is that the evidence made it abundantly clear that the subject line was not constructed, owned, operated or maintained by Entergy, and therefore, it was not a part of the electrical distribution facilities contemplated by the Agreement. Entergy maintains that the line was a service line, constructed and maintained by its customer. Furthermore, Entergy argues that the subject line was not within the described area allowed by the Agreement, and thus, the indemnity provision did not cover this scenario, maintaining that the trial court's reluctance to rely on the plat attached to the Agreement was clearly wrong.

STANDARD OF REVIEW
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). According to the Louisiana Supreme Court, the manifest error/clearly wrong standard is now well-established doctrine. Bonin v. Ferrellgas, Inc., 03-3024 (La.7/2/04), 877 So.2d 89, 94. The issue is not whether the trier of fact's determination was right or wrong, but whether it was reasonable. Id., 877 So.2d at 98. In Bonin, the supreme court stated:
Under the manifest error standard, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. On review, an appellate court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. In sum: [T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate *1161 court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. . . . Recognizing that great deference should be accorded to the fact finder, the court of appeal and this Court have a constitutional duty to review facts. To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. That being said, we reiterate that when two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong.
(Citations omitted.)
Bonin, 877 So.2d at 94-95.

LAW AND ANALYSIS
The general rules governing the interpretation of contracts apply in construing a contract of indemnity. Dean v. Griffin Crane & Steel, Inc., 05-1226 (La. App. 1 Cir. 5/5/06), 935 So.2d 186, 191. A contract of indemnity forms the law between the parties and therefore must be interpreted according to its own terms and conditions. The purpose of an indemnity agreement is to allocate the risk inherent in the activity between the parties to the contract. Liem v. Austin Power, Inc., 569 So.2d 601, 608 (La.App. 2 Cir.1990). The question to be considered in determining whether an indemnity agreement is enforceable is "whether the risk that resulted in the injury was one contemplated by the parties to the contract." Perkins v. Rubicon, Inc., 563 So.2d 258, 259 (La.1990).
Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. art. 2045. Courts are bound to give legal effect to all contracts, according to the true intent of the parties. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 479, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046. In instances where the mutual intention of the parties has not been fairly explicit, the court may consider all pertinent facts and circumstances, including the party's own conclusions rather than adhere to a forced meaning of the terms used in the contract. Belle Pass Terminal, Inc., 634 So.2d at 479-480.
The words of a contract must be given their generally prevailing meaning. LSA-C.C. art. 2047. Intent is to be determined in accordance with the plain, ordinary, and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable, and fair basis. Belle Pass Terminal, Inc., 634 So.2d at 480. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. LSA-C.C. art. 2048. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. art. 2050. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished the text. LSA-C.C. art. 2056. One of the best ways to determine what the parties intended in a contract is the method in which the contract is performed, particularly if done consistently over and over again for a period of many years. Belle Pass Terminal, Inc., 634 So.2d at 480. In other words, intent is an issue of fact that is to be inferred from all of the surrounding circumstances. Id.
*1162 In the instant case, the trial court handed down well-considered reasons for judgment in holding that the right-of-way privilege enjoyed by Entergy across LL & E's property (for almost twenty years at the time of plaintiff's alleged injury) was not solely limited to the plat attached to the Agreement. The trial court found that the purpose of the Agreement was to allow Entergy to provide electrical services to campsites leased by LL & E to various parties that were in existence at the time the Agreement was entered into, as well as to provide electrical service to those campsites that would be constructed in the future. As such, the trial court found that the subject line was a "necessary appurtenance" to the Entergy distribution system and the indemnity provision in the Agreement applied, holding that Entergy owed indemnification to LL & E for all damages, costs, and attorneys fees pursuant to the terms and conditions of the Agreement.
After reviewing this voluminous record and carefully considering the evidence and testimony regarding the original intent of the Agreement, we fully agree with the trial court's resolution of the indemnity issue, and adopt in part the trial court's excellent reasons for judgment as our own, as follows:
The [Agreement] states that Entergy is responsible for all personal injury and damages caused by the construction, existence, operation, and maintenance of the electric distribution line. However the Agreement does not define the term "electric distribution line." Therefore, this Court can and must consider evidence as the facts and circumstances at the time the contract was made.
Testimony was given by Jefferson DeBlieux, IV, a surveyor for LL & E, who stated that, sometime after 1973, additional camps were built and power lines were added to supply the new campsites with electricity. Mr. DeBlieux also indicated that the new campsites are not shown on the map attached to the 1973 Agreement. Mr. DeBlieux testified that, although LL & E does not have records to indicate that Entergy contacted LL & E to seek permission to install the additional power lines to the new campsites, LL & E knew of the new construction and did not object to it.
Testimony was also given by Entergy's expert Gerard Hergert, who also testified that Entergy had extended its own lines 520' past the original termination point, and found no record that Entergy had requested permission from LL & E to do so. Mr. Hergert further testified that the line from the pole to the camp is called a "service drop" which he referred to as an appurtenance to the distribution line and that it was expected that services [sic] lines were to be added as appurtenances to that distribution line.
The next witness to testify was Kermit Coulon, Jr., manager of the LL & E's Houma District Office and lease administrator, who confirmed that the accident occurred in Section 29 of LL & E's property. It was Mr. Coulon's understanding that the term "distribution line" as contained in the Agreement was a line supplying electricity to the customer's camp. Mr. Coulon further testified that when he executes a right of way on behalf of LL & E, it is considered giving Entergy the authorization to construct lines, appurtenances or whatever is involved in the project, and also that Entergy would hold LL & E harmless from any claims that might arise as a result of the existence of Entergy's facilities on LL & E's property. Mr. Coulon also gave his definition of "assigns" as used in the Agreement as anyone *1163 Entergy would designate to perform installation activity, whether it be a contractor or a customer. Mr. Coulon confirmed that LL & E was aware that power lines were being extended to connect the new campsites being constructed and that the new lines were considered part of the initial right of way [A]greement, including indemnities.
Testimony was also heard from Frederick Brooks, an electrical engineer on behalf of Entergy. Mr. Brooks testified that the lines that run from the transformer to the customer's point of delivery is called a service drop or a service line, which he considers part of the distribution system. Mr. Brooks testified that ownership of electricity transfers from the utility company to the customer at the point of delivery. However, Mr. Brooks also testified that he could find no publication which defined the term distribution line.
The deposition of Thomas Caswell Brown, former Superintendent for Entergy, was admitted as evidence for this Court's consideration. Mr. Brown testified that the term "electrical distribution" used in the Agreement was obtained from Entergy's counsel, and therefore he could not testify as to Entergy's intent of that term.
The Court notes that Mr. Hergert contradicted his own testimony on more than one issue. It was by Mr. Hergert's own admission that the service line providing electricity by Entergy to Mr. Braud's camp was an appurtenance to the distribution line.
The Court also notes that the cable used by Mr. Braud was supplied by Entergy at no cost to Mr. Braud.
After considering all of the pleadings, evidence, and testimony, this Court finds that Entergy believed that its right of way privilege was not limited to the plat attached to the Agreement. This Court also finds that the purpose of the Agreement was to allow Entergy to provide electrical services to those campsites in existence at the time of the 1973 Right of Way Agreement, as well as to provide electrical service to those campsites that would be constructed in the future.
Entergy offered to construct the Braud power line for a fee or, in the alternative, Mr. Braud could perform his own installation and could do so without obtaining permission from LL & E. Entergy would not have offered and provided such services to Mr. Braud and other additional campsites unless it believed that it had the authority to do so under the 1973 Right of Way Permit. If Entergy believed that it had such authority under the Agreement, then all of the provisions of the Agreement must be applicable, including the indemnity provision. Further, the property owned by LL & E which is listed in the Agreement indicates all of Section 29. The accident at issue occurred in Section 29, and therefore the damage and injuries sustained by Mr. Naquin fall within the parameters of the Agreement.
Therefore, this Court finds that the subject line was a necessary appurtenance to the Entergy distribution line system. Without the involved line, Mr. Braud would not have been able to receive the electricity distributed by Entergy.
This Court finds that the subject 580' power line was an appurtenance of the "electrical distribution line" as defined in the Agreement. Therefore, Entergy must uphold its contractual obligation to indemnify LL & E for all damages, costs, and attorneys fees, pursuant to the terms and conditions of the 1973 Right of Way Permit.
*1164 We also offer the following additional comments and reasons in support of the trial court's judgment. Entergy's own expert, Mr. Hergert, clearly testified that the subject line was an "appurtenance" to the distribution line. Appurtenances to the electric distribution line were included in the language of the Agreement. Mr. Hergert testified that it was understood that service lines would be added off of the distribution line in order to provide electricity to the customer. The trial court was not unreasonable in relying on Mr. Hergert's testimony to define the subject line as an appurtenance to the distribution line.
We find it very reasonable from the point of view of both parties to the Agreement to expect or anticipate that service lines would be necessary in order to completely provide electrical service to the leased campsites. Certainly, any line that distributed or provided electricity to a campsite would have been reasonably contemplated by LL & E and Entergy as being covered by the Agreement. Providing electrical service to the campsites was, after all, the intended purpose of the Agreement.[5] The other expert, Mr. Brooks, basically corroborated Mr. Hergert's testimony when he testified that the term "electric distribution line" would include a service line. Mr. Brooks further opined that the reason for the existence of an electric distribution line is to provide service to customers off the line, and additional service lines are expected without the necessity of additional right-of-way permits. Based upon the two expert witnesses' testimony, we conclude there was no manifest error in the trial court's factual finding that the subject line was an appurtenance to the electric distribution line. Furthermore, this interpretation best conforms to the object of the contract. See LSA-C.C. art. 2048.
The evidence presented at trial also established unequivocally that Entergy was the only entity that had permission to distribute electricity across the subject LL & E property. Entergy never questioned whether it had the right to extend electrical services to any of the subsequently-built campsites and Entergy never sought additional permission to extend electrical services to the other campsites. The evidence clearly revealed that all of the extensions were within the boundary of Section 29 and Section 28 as contemplated by the property description in the Agreement. Thus, the trial court reasonably concluded that Entergy believed that the right-of-way privilege was not limited to the plat attached to the Agreement, which depicted the original route of the distribution line. The trial court correctly considered the method in which Entergy and LL & E carried out the purpose of the Agreement (to supply electricity to the leased campsites) consistently over and over again for a twenty-year period and beyond. Intent behind a contract is an issue of fact that may be inferred from all of the surrounding circumstances, including the conduct of the parties before and after the formation of the contract. See Amoco Production Co. v. Fina Oil & Chemical Co., 95-1185 (La.App. 1 Cir. 2/23/96), 670 So.2d 502, 511, writ denied, 96-1024 (La.5/31/96), 673 So.2d 1037. This factual finding of the trial court was pertinent to the interpretation of the Agreement. We find no manifest error in the trial court's factual findings or its conclusion.
*1165 For the above and foregoing reasons, the judgment of the trial court is affirmed at Entergy's cost.
AFFIRMED.
NOTES
[1] Plaintiff and his wife, Gladys Naquin, brought suit individually, and plaintiff brought suit as administrator of the estate of his minor children, Wilson Naquin, Jr., Peter Naquin, and Chad Naquin. However, throughout this opinion we will refer to Mr. Naquin individually as plaintiff.
[2] LL & E is an oil and gas company that owns and maintains the subject property for its oil and gas operations as part of a 37-acre square tract of land. LL & E leased several recreational fishing and hunting campsites along a well canal located on the subject property.
[3] Braud subsequently sold the camp to Russell Baudoin in 1987. Baudoin continued to lease the campsite from LL & E and to purchase electrical service from Entergy for the camp.
[4] Naquin v. Louisiana Power & Light Co., 98-2270 (La.App. 1 Cir. 3/31/00), 768 So.2d 605, writ denied, 00-1741 (La.9/15/00), 769 So.2d 546; Naquin v. Louisiana Power & Light Co., 03-0220 (La.App. 1 Cir. 11/7/03), 857 So.2d 36 (unpublished).
[5] For the lead cases defining the nature of a powerline servitude as the right to transmit electric power to customers, see Hanks v. Gulf States Utilities Co., 253 La. 946, 221 So.2d 249, 251 (1969); Broomfield v. Louisiana Power & Light Co., 25,112 (La.App. 2 Cir. 9/22/93), 623 So.2d 1376, 1378-1379.